No. 23-3089

IN THE

# United States Court of Appeals
# for the Third Circuit

IN RE: MERCK MUMPS VACCINE LITIGATION

CHATOM PRIMARY CARE, P.C., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED; ET AL.,

*Plaintiffs-Appellees*,

v.

MERCK & CO., INC.,

*Defendant-Appellant*.

On Interlocutory Appeal from the United States District Court
for the Eastern District of Pennsylvania
No. 2:12-cv-3555-CFK, Judge Chad F. Kenney

## REDACTED OPENING BRIEF OF MERCK & CO., INC.

Lisa C. Dykstra
R. Brendan Fee
Zachary M. Johns
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-2921

Dino S. Sangiamo
Sally W. Bryan
Kathleen Hardway
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202

January 24, 2024

Neal Kumar Katyal
Jessica L. Ellsworth
Michael J. West
Kristina Alekseyeva*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*\* Admitted only in New York; practice
supervised by principals of the firm
admitted in D.C.*

*Counsel for Defendant-Appellant
Merck & Co., Inc.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1(b), Defendant-Appellant Merck & Co., Inc., discloses that it has no parent corporations, that no publicly held company holds 10% or more of its stock, and that there is no publicly held corporation which is not a party to the proceeding before this Court with a financial interest in the outcome of the proceeding.

January 24, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth (D.C. Bar No. 484170)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Appellant*
*Merck & Co., Inc.*

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...........................................................................v

GLOSSARY.................................................................................................ix

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES....................................................................1

STATEMENT OF RELATED PROCEEDINGS................................................2

INTRODUCTION .......................................................................................2

STATEMENT .............................................................................................5

    I.     FACTUAL BACKGROUND ...........................................................5

          A.    Merck's Mumps Vaccine ...................................................5

          B.    In The Late 1990s, Merck Complied With FDA's Request That It Increase The Release Potency In The MMR-II Vaccine ...........................................................7

          C.    In The Early 2000s, Merck Ran A Non-inferiority Study To Potentially Allow Merck To Lower The Potency Statement ...................................................9

          D.    In The Mid-2000s, FDA Granted Merck's Applications To Lower The Potency Statement On The MMR-II Label And For A ProQuad Vaccine........................11

          E.    FDA Approves GSK's Mumps Vaccine In 2022 .........12

    II.    PROCEDURAL HISTORY .........................................................18

STANDARD OF REVIEW ..........................................................................22

SUMMARY OF ARGUMENT ....................................................................22

Page

ARGUMENT ........................................................................................25

I.   MERCK'S STATEMENTS TO FDA ARE IMMUNE
     FROM ANTITRUST LIABILITY UNDER *NOERR-
     PENNINGTON* ...........................................................................25

     A.   Merck's FDA Submissions Do Not Implicate The
          Sham Exception As Defined By The Supreme Court
          And This Circuit ................................................................28

     B.   Plaintiffs' Claims About Misrepresentations In
          Merck's Submissions To FDA Do Not Affect The
          Application Of *Noerr-Pennington* Because The FDA
          Process Was Non-Adjudicatory .........................................32

     C.   No Disputed Issues Of Material Fact Precluded
          Summary Judgment For Merck............................................36

II.  THE DISTRICT COURT SHOULD HAVE GRANTED
     SUMMARY JUDGMENT TO MERCK BECAUSE
     PLAINTIFFS LACK SUFFICIENT EVIDENCE TO
     CREATE A TRIABLE ISSUE ON ANTITRUST INJURY ...................38

     A.   Plaintiffs Lack Evidence That Merck's Alleged
          Misconduct Caused GSK To Enter The Mumps-
          Vaccine Market At A Later Time Than It Would Have
          Otherwise ..........................................................................40

     B.   Plaintiffs Cannot Show That FDA, Had It Known Of
          Merck's Alleged Misrepresentations, Would Have
          Granted GSK A License Sooner Than 2022................................46

          1.   To show antitrust injury, Plaintiffs must
               establish that FDA would have granted GSK a
               license sooner than it did ......................................48

          2.   Plaintiffs cannot show that FDA "would have"
               granted GSK a license sooner than it did ..........................50

**TABLE OF CONTENTS—Continued**

Page

CONCLUSION ..................................................................................57

CERTIFICATION OF BAR MEMBERSHIP

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
263 F.3d 239 (3d Cir. 2001)................................................................... 26

*Advanced Disposal Servs. E., Inc. v. N.L.R.B.*,
820 F.3d 592 (3d Cir. 2016).................................................................. 54

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)............................................................................... 30

*Amerinet, Inc. v. Xerox Corp.*,
972 F.2d 1483 (8th Cir. 1992)............................................................... 43

*Argus Inc. v. Eastman Kodak Co.*,
801 F.2d 38 (2d Cir. 1986).................................................................... 40

*Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*,
185 F.3d 154 (3d Cir. 1999)....................................................... 30, 31, 35

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)............................................................................... 39

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*,
118 F.3d 178 (3d Cir. 1997)................................................................... 38

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)............................................................................... 38

*California Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)............................................................................... 32

*Chandler v. Phoenix Servs., L.L.C.*,
45 F.4th 807 (5th Cir. 2022) ................................................................. 41

*Cheminor Drugs, Ltd. v. Ethyl Corporation*,
168 F.3d 119 (3d Cir. 1999)........................................... 33, 34, 35, 36

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)......................................................................... 28, 29

*City of Pittsburgh v. W. Penn. Power Co.*,
147 F.3d 256 (3d Cir. 2017)............................................................ 38, 48

Page(s)

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
749 F.2d 154 (3d Cir. 1984)............................................................. 31

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) .............................................................. 26, 28, 30

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993)............................................................. 42

*Halsey v. Pfeiffer*,
750 F.3d 273 (3d Cir. 2014)............................................................. 45

*In re Canadian Imp. Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006)............................................................. 48

*In re Mallinckrodt PLC*,
638 B.R. 57 (D. Del. 2021)............................................................. 50

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017)...................................................*passim*

*J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*,
485 F.3d 880 (6th Cir. 2007)............................................................. 43

*Kottle v. Northwest Kidney Centers*,
146 F.3d 1056 (9th Cir. 1998)............................................... 31, 32, 33

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008) ............................... 39, 50, 51, 57

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
641 F.3d 834 (7th Cir. 2011)................................... 32, 33, 34, 35

*Merck Sharp & Dohme Corp. v. Albrecht*,
139 S. Ct. 1668 (2019) ............................................................. 36

*Pichler v. UNITE*,
542 F.3d 380 (3d Cir. 2008)............................................................. 22

*Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*,
508 U.S. 49 (1993) ................................................................ 28, 31, 37

*Sound Ship Bldg. Corp. v. Bethlehem Steel Co. (Inc.)*,
533 F.2d 96 (3d Cir. 1976)............................................................. 41

Page(s)

*Spartan Concrete Prods., LLC v. Argos USVI, Corp.*,
929 F.3d 107 (3d Cir. 2019) ............................................................ 43

*United Mine Workers v. Pennington*,
381 U.S. 657 (1965) ......................................................................... 26

*U.S. ex rel. Krahling v. Merck & Co.*,
44 F. Supp. 3d 581 (E.D. Pa. 2014) ................................................. 18

*U.S. Futures Exch., L.L.C. v. Board of Trade of the City of Chicago, Inc.*,
953 F.3d 955 (7th Cir. 2020) ............................................................ 32

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ......................................................................... 48

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
395 U.S. 100 (1969) ......................................................................... 40

CONSTITUTIONAL PROVISION:

U.S. Const. amend. I ......................................................................... 25

STATUTES:

15 U.S.C. § 4 ...................................................................................... 1

15 U.S.C. § 15(a) ............................................................................... 1

15 U.S.C. § 22 .................................................................................... 1

21 U.S.C. § 355(o)(4)(A) .................................................... 5, 20, 35, 54

28 U.S.C. § 1292(b) ...................................................................... 1, 22

28 U.S.C. § 1331 ................................................................................ 1

28 U.S.C. § 1337 ................................................................................ 1

RULE:

Fed. R. Civ. P. 56(a) ......................................................................... 22

REGULATION:

21 C.F.R. § 630.51 (1996) ................................................................ 10

Page(s)

**OTHER AUTHORITIES:**

FDA, Summary Basis for Regulatory Action,
BLA/NDA STN: 125748/0 (June 2, 2022),
https://www.fda.gov/media/159545/download ...................................................... 18

FDA, Domestic MOUs, MOU No. 225-14-017,
https://www.fda.gov/about-fda/fda-memoranda-
understanding/domestic-mous (last visited Jan. 24, 2024) ................................. 56

Memorandum of Understanding Between the Food and Drug
Administration and the Centers for Disease Control and
Prevention 225-14-017 (amended June 30, 2023),
https://www.fda.gov/about-fda/domestic-mous/mou-225-14-017 ...................... 56

# GLOSSARY

AIGENT          Anti-IgG Enhanced Neutralization assay

Anti-IgG        Anti-Human Immunoglobin G

BLA             Biologics License Application

BPDR            Biologics Product Deviation Report

CDC             Centers for Disease Control and Prevention

DOJ             Department of Justice

ELISA           Enzyme-Linked Immunosorbent Assay

FCA             False Claims Act

FDA             Food and Drug Administration

GSK             GlaxoSmithKline plc

PRN             Plaque Reduction Neutralization assay

sBLA            Supplemental Biologics License Application

TCID            Tissue Culture Infectious Dose

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 15 U.S.C. §§ 4, 15(a), and 22, and 28 U.S.C. §§ 1331, 1337. The District Court denied Merck's motion for summary judgment on July 27, 2023, and granted Merck's motion for certification of interlocutory appeal under 28 U.S.C. § 1292(b) on October 10, 2023. This Court granted Merck's petition for permission to appeal under § 1292(b) on November 17, 2023. This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUES

1.     Whether there is no triable fact as to whether the "sham" exception to *Noerr-Pennington* immunity applies here, where Plaintiffs claim to have been injured by the outcome of Merck's regulatory petitioning to FDA, after which FDA did not require Merck to take any action regarding its mumps vaccine. Appx71-77; *see also* ECF 273 at 15-21 (Merck's motion for summary judgment).[1]

2.     Whether there is no triable fact as to antitrust injury, where Plaintiffs lack evidence that a competitor delayed entering the market based on any alleged Merck misstatements or that FDA would have granted the competitor a vaccine license at an earlier point in time but for Merck's alleged misstatements. Appx71, Appx79-81; *see also* ECF 273 at 22-34.

---

[1]     Unless otherwise noted, all "ECF" cites refer to the District Court's docket.

## STATEMENT OF RELATED PROCEEDINGS

This appeal is related to *U.S. ex rel. Krahling v. Merck & Co.*, No. 23-2553. The cases share a largely overlapping record, which shows no material misconduct by Merck. This appeal raises independent reasons that Plaintiffs' sole remaining antitrust claim—for monopolization—fails as a matter of law.

## INTRODUCTION

After a False Claims Act (FCA) suit was unsealed in 2012 involving allegations that Merck improperly concealed issues with its mumps vaccine from the Food and Drug Administration (FDA), Plaintiffs repackaged those allegations into a claim that Merck violated Section 2 of the Sherman Act. According to Plaintiffs, by presenting false information to FDA, Merck unlawfully maintained a monopoly over an alleged market for mumps vaccines because those alleged misrepresentations caused a delay in when GlaxoSmithKline plc (GSK) commercialized and received FDA approval for a competing vaccine. In Plaintiffs' multistep account, had FDA known the information Plaintiffs say was misleading or omitted in Merck's regulatory submissions or in its mumps-vaccine label, FDA would have taken regulatory action against Merck—including requiring Merck to change certain statements on its mumps-vaccine label; because GSK had to show that its vaccine was "non-inferior" to Merck's vaccine to obtain an FDA license and enter the U.S. market, FDA's actions against Merck's vaccine

would have "lowered the bar" for GSK to obtain an FDA license; this lowered bar would have meant GSK would have entered the market sooner; and that, in turn, would have led to Plaintiffs paying less for mumps vaccines. Plaintiffs' claim fails because discovery showed no actionable fraud on FDA by Merck, as detailed in the related case. Plaintiffs' antitrust claim also fails as a matter of law for two additional reasons detailed in this appeal.

*First*, Merck's statements to FDA as part of FDA's oversight of Merck's mumps vaccine are immune from antitrust liability under the *Noerr-Pennington* doctrine, which protects all non-sham petitioning activity. The District Court erred in concluding there was a triable fact as to whether three submissions (out of thousands of regulatory communications between Merck and FDA about the mumps vaccine) meet the standard for the sham exception. As a matter of law, Merck's communications with FDA were not an abuse of process—i.e., objectively baseless activity undertaken to directly cause harm to a competitor—as demonstrated by the fact that FDA, after conducting "an independent review" of "the merits of each of the submissions," took no action to require any change to Merck's mumps-vaccine label or to request a recall of any vaccine product. Appx76. Nor were the submissions made in the sort of adjudicative proceedings in which the sham exception exclusively applies.

*Second*, Plaintiffs lacked evidence creating a triable fact as to whether their asserted injury was causally connected to Merck's alleged misconduct. Discovery revealed *no evidence* causally connecting Merck's alleged misstatements with the timing of GSK's FDA approval for its competing vaccine. GSK's corporate representative testified unequivocally that there were five—and only five—reasons GSK took as long as it did to bring its competing product to market. Not one of them has anything to do with the three supposed "sham" submissions that contain Merck's alleged misstatements to FDA, or the statements that Plaintiffs say Merck improperly convinced FDA to leave on the label. In addition, Plaintiffs have no evidence that FDA "would have" granted GSK a license sooner than it did but for Merck's alleged misstatements. *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 167 (3d Cir. 2017). The statements on Merck's mumps-vaccine label that Plaintiffs say FDA would have required Merck to change, which then would have affected what FDA required of GSK, *are still on the label today*, despite FDA's awareness of Plaintiffs' contentions and their evidence—a fact which, in part, doomed the FCA case from which Plaintiffs' claims are derived.

In a most unusual twist, after discovery, Plaintiffs received court permission for their expert—former FDA Commissioner Dr. David Kessler—to explain directly to the head of FDA (and other high-ranking public-health officials) his

concerns about Merck's mumps vaccine. Dr. Kessler's submissions addressed the *same* label statements that Plaintiffs contend FDA left on the label only because of Merck's misrepresentations. But more than four years have passed, and FDA has done nothing to require they be changed—despite having a statutory duty to revise vaccine labels if it learns information showing a label is materially misleading. *See* 21 U.S.C. § 355(o)(4)(A). FDA's decision not to initiate a label change in light of the same facts Plaintiffs say would have caused a label change decades ago leaves Plaintiffs without a triable fact on the issue of causal antitrust injury.

For these reasons, this Court should hold that Plaintiffs' antitrust claim independently fails as a matter of law because the *Noerr-Pennington*'s sham exception is inapplicable to the facts of this case and because Plaintiffs cannot demonstrate any causal link between Merck and either GSK's or FDA's actions, and thus cannot establish causal antitrust injury. After so holding, this Court should direct entry of summary judgment for Merck.

## STATEMENT

### I. FACTUAL BACKGROUND

#### A. Merck's Mumps Vaccine.

From 1967 until 2022, Merck was "the sole licensed mumps vaccine provider in the United States." Appx52. Today, Merck sells a trivalent measles-mumps-rubella vaccine called M-M-R® II (MMR-II) and a quadrivalent vaccine

called ProQuad® (ProQuad) that also includes a varicella (chickenpox) component. Appx144. The mumps component in both is identical.

The *potency* of Merck's mumps vaccine is measured in units of "tissue culture infectious dose," which represents the viral concentration necessary to induce cell death or pathological changes in 50% of inoculated cell cultures (known as $TCID_{50}$). KrahlingAppx256.[2] It can be referred to as a whole number (*e.g.*, "20,000 $TCID_{50}$") or the logarithmic equivalent (*e.g.*, "4.3 $\log_{10} TCID_{50}$"). Appx145; KrahlingAppx256. Like all vaccines with live viral cells, the mumps vaccine's potency decreases between initial release and its expiration, known as end-expiry. Appx144. As of the late 1990s, the labeled potency was the equivalent of 4.3 $\log_{10} TCID_{50}$. Appx56. Since 2007, the labeled potency is the equivalent of 4.1 $\log_{10} TCID_{50}$. Appx6687; Appx154.

Merck's mumps-vaccine's label refers to previously conducted "[c]linical studies" in which "a single injection of the vaccine induced … mumps neutralizing antibodies in 96%" of study participants. Appx6681 (1999 label). The referenced studies were conducted in the 1970s. Appx6685 (reference 16).

---

[2] All cites to "KrahlingAppx" refer to the Joint Appendix filed in the related case *Krahling v. Merck*, No. 23-2553. This Court can properly consider the documents in that Joint Appendix because Merck, in moving for summary judgment in this case, incorporated its motions for summary judgment in that case. *See* Appx51 n.2; ECF 273 at 1 n.1.

Merck's mumps vaccine has a two-year shelf-life. Each vial of vaccine contains the expiration date for that vial. Appx56.

**B.      In The Late 1990s, Merck Complied With FDA's Request That It Increase The Release Potency In The MMR-II Vaccine.**

From 1967 until the late 1990s, Merck had understood the 4.3 $\log_{10}$ TCID$_{50}$ potency figure on the label to refer to the minimum potency level in the vaccine at its release to the market. Appx145; Appx56. Merck was transparent with FDA about its understanding. KrahlingAppx15623-39. But as part of an effort to improve labeling consistency across drugs, FDA determined that the potency statement should be interpreted as reflecting the potency at end-expiry. Appx145. Based on FDA's own calculations of potency loss, FDA instructed Merck in 1999 to increase the minimum release potency to 5.0 $\log_{10}$ TCID$_{50}$ so the vaccine would still comply with the 4.3 $\log_{10}$ TCID$_{50}$ potency claims at end-expiry. Appx57; *see also* Appx1078; KrahlingAppx16354. Merck did so. Appx57. FDA requested this change for *future* lots, without expressing concern about lots still on the market that had been released under the 4.3 $\log_{10}$ TCID$_{50}$ minimum release potency even though those lots would be below that level at end-expiry.

Several months after the 1999 FDA-directed release-potency increase, a separate FDA division inspected Merck's manufacturing division and alerted Merck to what Merck and FDA already knew: "certain lots of mumps vaccines" manufactured before the increase were below the label's potency statement by end-

expiry.  *Id.*  FDA memorialized this concern twice, first in a Form 483, which "notifies the company's management of objectionable conditions," and second in a February 2001 Warning Letter.  Appx147 (citation omitted); Appx57 & n.5.

As part of the Warning Letter, FDA directed Merck to submit an analysis of the expected end-expiry potency range for the pre-increase lots still on the market. *See id.*  Merck did so, explaining that "the expected average potency at expiry is $3.6 \log_{10} \text{TCID}_{50}/\text{dose}$."  Appx58 (citation omitted).  An initial draft response had stated that Merck "released to market 225 lots of MMR-II that had an end-expiry potency potentially lower than $4.3 \log_{10}$ minimum mumps potency specification, with 107 of these lots being 'a compliance issue.'"  *Id.* (citation omitted).  Because FDA's Warning Letter had requested an analysis of the expected end-expiry range, and not identification of specific lots, Merck's as-submitted response provided that requested analysis and did not specifically mention the number of lots.  *Id.*[3]  "FDA closed its Warning Letter without requiring any lots to be withdrawn from the market."  Appx59.

When Merck had data showing that specific pre-increase lots *did* test below 4.3 at end-expiry, it alerted FDA by filing two Biologics Product Deviation

---

[3]   This information was otherwise available to FDA because, as the discovery record showed, Merck provided the release potency of every lot to FDA and FDA approved every lot's release.  KrahlingAppx290-291; KrahlingAppx11431; KrahlingAppx15636.

Reports (BPDRs) in March and April 2001. *See* Appx9728-34 (March 2001 BPDR); Appx9735-41 (April 2001 BPDR). FDA did not follow up on these reports.

Before there was data on the end-expiry potency level for vaccine manufactured after the release-potency increase, some Merck employees were concerned that the FDA-directed increase would be insufficient to ensure every lot would meet the label's potency statement at end-expiry. Appx59. But those initial concerns proved unfounded. Data from Merck's stability program measured the potency for lots after the 1999 release-potency increase and showed the vaccine maintained the required potency. KrahlingAppx16370-71.

### C. In The Early 2000s, Merck Ran A Non-inferiority Study To Potentially Allow Merck To Lower The Potency Statement.

When FDA directed Merck to increase the release potency in 1999, no one viewed the increase as necessarily permanent. Merck and FDA discussed a clinical trial to support reducing the labeled potency level. Appx59; Appx149. This study became Protocol 007. Appx59.

Protocol 007 involved two types of tests, or assays, which were jointly designed with FDA and run in different labs: "(1) a plaque reductions neutralization assay ('PRN') and (2) an enzyme-linked immunosorbent assay ('ELISA')." *Id.* These assays study distinct effects the vaccine can have on blood samples incubated with the virus and exposed to certain conditions. Appx60-61

9

(describing how these assays work). FDA approved the strain of the mumps virus Merck used in the PRN. KrahlingAppx227. FDA also approved—and in fact had recommended—using a type of rabbit antibody known as anti-human Immunoglobin G ("anti-IgG") in the PRN. Appx61; KrahlingAppx11414, KrahlingAppx11769-70 (FDA recommendation). For this reason, the PRN is alternatively referred to as the Anti-IgG Enhanced Neutralization assay, or "AIGENT."

According to FDA, Protocol 007 data could support a label change if (1) the seroconversion rate in the group receiving the lower-potency vaccine was within 5% of the seroconversion rate in the group receiving the current vaccine, and (2) "the lower limit of the confidence interval of the seroconversion rate in the group receiving the" lower-potency vaccine was "above 90%." Appx60-61. In support of these targets, FDA cited a revoked FDA regulation requiring that, "[t]o qualify for license," a "Mumps Virus Vaccine" must trigger a "protective antibody response … in at least 90 percent of" participants in five clinical studies. 21 C.F.R. § 630.51 (1996); Appx8013 (point 9) (citing "the revoked 21 CFR 630.51").

FDA approved the PRN's final design, and Merck conducted the assay in one of its research labs. After a technician working in that lab reported to FDA that Merck was improperly recounting certain data, FDA conducted a thorough

investigation and ultimately issued Merck a Form 483 observing that "raw data [was] being changed with no justification." Appx61 (citation omitted).

Merck thoroughly cooperated with FDA's investigation and filed a formal response to the Form 483. Appx152. There, Merck explained, among other things, that it had "conducted a reanalysis of the data set," which "revealed 'no evidence of a difference between the corrected and uncorrected data sets with respect to seroconversion.'" Appx152-153 (citation omitted).

In the end, because no protocol for a reanalysis of plaque counts had been set in advance, FDA declined to accept the corrected data sets. KrahlingAppx241. FDA instead permitted Merck to submit the original data sets from the PRN to support a potential label change and closed out the Form 483 without further action. Appx153.

### D. In The Mid-2000s, FDA Granted Merck's Applications To Lower The Potency Statement On The MMR-II Label And For A ProQuad Vaccine.

In January 2004, Merck submitted a supplemental Biologics License Application (sBLA) to FDA requesting to lower the MMR-II label's potency statement from 4.3 to 4.1 $\log_{10}$ TCID$_{50}$ per dose. Appx153. Merck provided data from the Protocol 007 PRN and ELISA assays. Appx62. FDA determined that it would not approve the sBLA based on the PRN data, mainly due to insufficient

quantity of data.  KrahlingAppx242.  But FDA told Merck it could amend the sBLA to rely exclusively on ELISA data.  Appx62.

Merck followed FDA's recommendation and amended the application to include an analysis of ELISA data showing that 4.1 $\log_{10}$ TCID$_{50}$ potency provoked a comparable immune response.  Appx154.  Based on that data, FDA approved Merck's sBLA to change the labeled potency from 4.3 to 4.1 $\log_{10}$ TCID$_{50}$ in December 2007.  Appx62.  By this point, however, Merck had been using a 5.0 $\log_{10}$ TCID$_{50}$ release potency for eight years in the United States (and in other countries) and opted against introducing manufacturing complexities that would come from "reduc[ing] its minimum release potency."  Appx154.

Merck also used ELISA data as part of its Biologic License Application (BLA) for ProQuad, which FDA approved in September 2005.  Appx62.

### E.     FDA Approves GSK's Mumps Vaccine In 2022.

GSK, like Merck, manufactures two vaccines with a mumps-vaccine component: Priorix, a trivalent measles-mumps-rubella vaccine; and Priorix-Tetra, a quadrivalent measles-mumps-rubella-varicella vaccine.  Appx54.  Priorix was licensed in Europe in 1998 and in the United States in 2022.  *Id.*  Priorix-Tetra is licensed only "*outside* the United States."  *Id.*  The mumps strain in both GSK's

vaccines "is derived from the mumps strain in Merck's mumps-containing vaccine," that is, the Jeryl Lynn strain. *Id.*

FDA approval is required to sell a vaccine in the United States. Appx393. When considering whether to license a vaccine, FDA considers, among other things, the vaccine's safety and efficacy, which are determined based on three phases of clinical trials. *Id.*

In 1997, GSK began the process of seeking an FDA license to sell Priorix in the United States. Because Merck's MMR-II vaccine was already on the market, GSK understood that its clinical trials had "to study the immunogenicity and safety of MMR-II versus Priorix and demonstrate that Priorix was non-inferior to MMR-II." Appx63. GSK chose to do that by attempting to "mirror[] Merck's label." *Id.*

Merck understood that if Priorix were approved by FDA, it would affect Merck's sales of MMR-II. Appx56. As is commonplace when products in any industry face new competition, Merck established an internal "Competitive Defense Task Force," which internal marketing documents describe as part of an "initiative[] to delay and disrupt the launch of Priorix" in the United States. Appx55.

GSK's path to the U.S. market, however, turned out to be plagued by setbacks on its own. A few months after GSK applied to begin clinical trials, FDA placed GSK's program "'on clinical hold' due to concerns, including about GSK's

safety data" and the assay GSK "used to determine" seroconversion.  Appx63

(citation omitted).  A few months later, "FDA sent GSK a letter with fifty-two

comments on GSK's proposed clinical development for Priorix," which GSK

understood to be "criticisms of … the proposed study's design and the types of

assays to be used to test each vaccine component," as well as "the quality of data

derived from GSK's clinical testing outside the United States, the safety of the

mumps strain, and the sample size of those studies."  Appx63-64.

In February 1998, GSK gave FDA additional information regarding its

seroconversion assays.  Appx1114.  GSK reported that the test results showed that



*Id.*  FDA concluded that

*Id.* (citations omitted).  This was the same rate, based on a prior

FDA regulation, that FDA would later require Merck to show in Protocol 007.  *See*

*supra* p. 10.

In June 1998, "FDA lifted the clinical hold" on GSK's program.  Appx64.

FDA nevertheless continued to question GSK about, among other subjects

Appx395-397.  FDA concluded in November 1998 that

*Id.*  Then, in March

1999, "FDA denied GSK's request for a 'pre-BLA' meeting, which typically occurs before a manufacturer submits a final BLA for vaccine approval." Appx64. GSK interpreted that denial to reflect FDA's conclusion that GSK's "safety database" was unacceptable and that FDA "nee[ed] [an] additional safety study." *Id.* (citation omitted). Months later, GSK again internally reported that FDA continued to require "an additional safety study." *Id.* This safety study was estimated to "cost between $10 million and $20 million." *Id.* FDA also requested "additional information on mumps serology"—that is, the mumps seroconversion rate. *Id.*

The issues with GSK's testing converged with a market development: Merck's quadrivalent ProQuad vaccine was expected to be released to the market in 2001. *See id.* In response, GSK, in April 2000, made a business decision to deprioritize development of Priorix and its quadrivalent vaccine Priorix-Tetra. Appx397. GSK determined that, if ProQuad "succeeded, GSK would revive its development of" Priorix-Tetra, "but if [ProQuad] failed, it would prioritize Priorix." Appx65. GSK accordingly "cease[d] all work" supporting its Priorix license application during this time, apart from, among other things, working to validate its seroconversion assays. *Id.*

Two years later, GSK completed a risk assessment for Priorix and Priorix-Tetra. Appx397. GSK's marketing team recommended that GSK pursue Priorix-

Tetra and "[r]e-address" Priorix "only if [Priorix-Tetra] has proven not viable from a development perspective." Appx65 (citation omitted).

In June 2003, GSK acted on that recommendation and formally put its development of Priorix "on hold." Appx65. GSK cited both "budget restraints"—GSK estimated that it would cost roughly $33 million to develop Priorix—and "business reasons" for this decision. Appx398 (citation omitted). "One of the business reasons for discontinuing development of Priorix was that [ProQuad] was near licensure in the United States." Appx65. GSK's analysis was straightforward: GSK expected that if ProQuad successfully launched, healthcare providers would switch to using that quadrivalent vaccine and thus use a trivalent vaccine like Priorix less often. Appx398. GSK accordingly decided to wait and see how ProQuad performed, and then revisit its Priorix program in 2004. Appx65.

GSK's development of Priorix-Tetra ran into roadblocks of its own. The good news for GSK was that its Phase II study comparing its vaccine to Merck's vaccine showed that GSK's *mumps* component was non-inferior to Merck's mumps component. Appx568. ██████████████████████████████ ██████████████████████████████████████████ Appx20-21. These results led GSK ████████████████████████ ██████████████████████████████ Appx554; *see*

16

*also* Appx399-400.  Around the same time, in 2009, the Centers for Disease Control and Prevention (CDC) updated its vaccination-schedule recommendation, which created an opening for a measles-mumps-rubella vaccine like Priorix to be used as a child's "first dose" of a two-dose vaccination schedule.  Appx66.

In 2010, GSK restarted its development of Priorix and met with FDA to discuss Phase III clinical trials.  Appx400.  The next year, GSK alerted FDA that it planned to use the same ELISA assay Merck had used in Protocol 007 to validate its seroconversion assays as part of Phase III.  Appx66.  That ELISA had become commercially available in 2009 when the lab in which it was run was purchased by an independent research company.  *Id.*  FDA granted GSK permission to use that assay in 2012, and that same year, GSK launched "five Phase III clinical studies for Priorix."  *Id.*

GSK testified during discovery that it waited until 2012 to launch these clinical trials because it chose to invest its research-and-development budget in other vaccines that it believed would have greater commercial value than Priorix.  Appx401.  In addition, an internal GSK document states that "GSK's Phase III trials started so late because[]" GSK's discussions with FDA regarding its seroconversion assays "proved to be protracted, since [GSK] could not meet the serological acceptability criteria" that FDA required ("a lower bound … for the response rate ≥90%)."  Appx66-67 (citation omitted).  This document states that

"having access to the Merck Mumps ELISA … facilitated these discussions."
Appx67.

In 2021, eleven years after first meeting with FDA to discuss its Phase III trials, GSK submitted a license application to FDA for Priorix. *See* FDA, Summary Basis for Regulatory Action, BLA/NDA STN: 125748/0 (June 2, 2022), https://www.fda.gov/media/159545/download. In June 2022, FDA approved Priorix as non-inferior to Merck's mumps vaccine. *See id.*; Appx68.

## II. PROCEDURAL HISTORY

In 2010, two former Merck employees brought a *qui tam* action against Merck under the FCA alleging that Merck fraudulently conducted the PRN assay as part of Protocol 007 to hide that its mumps vaccine had become less efficacious over time. *See Krahling v. Merck*, No. 23-2553 (3d Cir.).

In 2012, after the FCA case was unsealed, Plaintiffs—two doctors and a primary-care practice purporting to represent a class of MMR-II purchasers—filed this antitrust suit. As the District Court recognized, Plaintiffs "based their Complaint on the *qui tam* action filed by the Relators." *U.S. ex rel. Krahling v. Merck & Co.*, 44 F. Supp. 3d 581, 588 (E.D. Pa. 2014). "Based on the same allegations, Plaintiffs allege that [Merck's] manipulation and misrepresentation of the seroconversion rate of the Mumps Vaccine" to FDA "led to Defendant's monopoly of the relevant market in violation of the Sherman Act." *Id.*

As relevant here, Plaintiffs contend that Merck made it harder for GSK to show that Priorix was non-inferior to MMR-II by including misleading information or omitting information about Merck's mumps vaccine in submissions to FDA and its public statements on the MMR-II label. Appx54-55; Appx80. Plaintiffs identified exactly three submissions as sham petitioning: Merck's "2001 responses to the FDA Form 483 and Warning Letter and BDPRs." ECF 295 at 60 (Plaintiffs' corrected opposition to Merck's motion for summary judgment). The alleged material misrepresentations and omissions in those responses relate to the ability of Merck's mumps vaccine to maintain its potency through its shelf-life. Plaintiffs argued that Merck's misstatements caused FDA not to "lower the bar" in some undefined way for GSK to show non-inferiority, which caused GSK to bring Priorix to market at a later time, which in turn caused Plaintiffs to be overcharged for mumps vaccines. *See generally id.* at 8-36. Plaintiffs' position is that, had FDA known the information Plaintiffs say was misleading or omitted, it would have made Merck take action, including changing aspects of its mumps-vaccine label, which would have made it easier for GSK to show non-inferiority, which would have led to GSK's Priorix coming on the market sooner.

After discovery, Plaintiffs, joined by FCA Relators, sought permission for their joint expert—former FDA Commissioner Dr. David Kessler—to make a submission directly to the heads of FDA, CDC, and the Department of Health and

Human Services and other high-ranking individuals at those agencies spelling out his view of what discovery in this case had shown; this would ensure that those public health officials could evaluate his opinions and their merit. Appx305-383 (transcript of hearing where Plaintiffs' counsel argued "on behalf of" Plaintiffs and FCA Relators). The court (Magistrate Judge Lynne Sitarski) authorized this submission "so that those officials [could] determine what response, if any, is appropriate to address any potential public health issue." Appx301.

Dr. Kessler made this submission to the FDA Commissioner, the Director of FDA's Center for Biologics Evaluation and Research, and the Office of Chief Counsel at FDA (among others) in October 2019. *See* KrahlingAppx15605-15621 (initial submission); KrahlingAppx15686-95 (reply). According to Dr. Kessler, his findings implicated a "significant public health concern," and he urged the agencies to act accordingly—including by "[r]evising the labels for Merck's mumps-containing vaccines to accurately reflect what is known about how well this vaccine is actually working today." KrahlingAppx15619-21. Merck simultaneously submitted its own responses to Dr. Kessler's analyses. KrahlingAppx15623-718.

FDA has a statutory duty to "promptly" revise vaccine labels if it "becomes aware of new information" showing a label is materially misleading. 21 U.S.C. § 355(o)(4)(A). More than four years have passed since Dr. Kessler's submission,

20

and FDA has taken no action to change the label of Merck's mumps vaccine, or any other action, in response to Dr. Kessler's concerns.

Merck moved for summary judgment in January 2020. Merck explained that Plaintiffs could not base a federal antitrust claim on statements in Merck's submissions to FDA because the submissions were petitioning activity immune from antitrust liability under the *Noerr-Pennington* doctrine, and that Plaintiffs could not establish causal antitrust injury.

The District Court disagreed. On *Noerr-Pennington*, the court held that Merck's submissions to FDA constituted petitioning activity, but that there was a triable question of fact as to whether those three submissions were sham petitioning exempt from *Noerr-Pennington*'s protections. Appx75-76. As for causal antitrust injury, the court held that a genuine issue of material fact existed as to whether Merck had caused Plaintiffs' injuries, pointing to the following "pieces of evidence … establish[ing] this dispute": (1) GSK only received FDA approval for Priorix after the ELISA that Merck had developed became commercially available; (2) internal Merck documents showed Merck did not want to change its label in a way that would make it easier for GSK to enter the market; and (3) GSK's expert predicted GSK would get approval after the ELISA assay that Merck had developed became commercially available. Appx80-81. Although GSK had definitively testified as to the specific "independent business reasons" for its

21

timeline in obtaining FDA approval for Priorix, the court found there was still "a question of fact for the jury" on whether Merck had caused antitrust injury to Plaintiffs. Appx81. The court did not address the lack of evidence to show that FDA "would have" made any different decisions with respect to the standards the agency would apply to GSK's vaccine approval, even though *Wellbutrin*, 868 F.3d at 165, requires such a showing.[4]

The court certified its *Noerr-Pennington* and antitrust-injury holdings for interlocutory appeal under 28 U.S.C. § 1292(b). Appx95. This Court granted Merck's petition for permission to appeal. *See* No. 23-3089, ECF 1 at 1-2.

## STANDARD OF REVIEW

The District Court's denial of summary judgment is reviewed *de novo*, with this Court "applying the same standard as the District Court." *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008). Summary judgment is appropriate if "there is no genuine issue as to any material fact and … the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## SUMMARY OF ARGUMENT

**I.** The *Noerr-Pennington* question before this Court is a narrow one: does a triable issue of fact exist as to whether Merck's petitioning activity in providing

---

[4] The court entered summary judgment in Merck's favor on Plaintiffs' state-law consumer-protection claims, Appx83-87, which are not at issue in this appeal.

certain information to FDA as part of FDA's regulatory oversight of Merck's mumps vaccine amounted to "sham" petitioning exempt from *Noerr-Pennington* immunity. The answer is no.

**A.** As the Supreme Court and this Circuit have explained several times over, the sham exception extends only to situations where a party engages in an abuse of process by filing a lawsuit or submitting a petition seeking to directly interfere with a competitor's business even though the suit or petition is objectively baseless. But here, as Plaintiffs themselves agree, the point of Merck's filings was to provide sufficient data to FDA for the agency to act favorably towards Merck, which is in fact what happened. Merck's submissions were not objectively baseless or an abuse of process. The sham exception does not apply on these facts as a matter of law.

**B.** Plaintiffs' view that Merck should have included additional or different information in its responses to the Form 483 and Warning Letter or its BPDRs does not turn Merck's petitioning activity into a sham. This Court and others have squarely rejected such a broad carveout to *Noerr-Pennington*. And no court has held that a misrepresentation or omission, even when it exists, triggers the sham exception in the context of non-adjudicative, discretionary decision-making by an agency. And here, to be clear, Merck's Warning Letter response told FDA what it predicted the average end-expiry potency would be for all lots that pre-dated the

1999 release-potency increase—3.6 $\log_{10}$ $TCID_{50}$; Merck's BPDR submissions informed FDA when Merck had data that certain lots did fall below the end-expiry potency; and Merck's stability program ensured the actual potency of lots manufactured after the release-potency increase did in fact meet that end-expiry potency. None of the information Plaintiffs say Merck could have additionally included went to the core of Merck's petitioning activity.

**C.** The District Court seemed to get caught up in whether the parties agreed on whether Merck's submissions were *in fact* as thorough, detailed, or accurate as they could have been. But that issue should not have precluded summary judgment because even where a misrepresentation is present, it will not turn petitioning activity in a non-adjudicative context into a sham as a matter of law.

**II.** The District Court also erred in concluding that Plaintiffs had presented evidence sufficient to create a triable fact on antitrust injury.

**A.** Plaintiffs' antitrust-injury argument hinges on GSK being delayed in its launch of Priorix by supposedly inflated statements on Merck's label. But the record conclusively refutes that this occurred: GSK's corporate representative testified that no statements on Merck's mumps-vaccine label caused GSK to delay its vaccine and specifically attributed the timing of Priorix's launch to five (and only five) distinct business reasons having nothing to do with Merck's label. No reasonable jury could conclude that the statements Merck made to FDA (or the

public) about the information on its mumps-vaccine label caused Plaintiffs' injury in the face of this evidence.

**B.** Plaintiffs likewise cannot show that but for any alleged misstatements in Merck's submissions to FDA or on Merck's mumps-vaccine label, FDA "would have" granted GSK a license sooner. But such a showing is required under this Court's precedent. *See Wellbutrin*, 868 F.3d at 165. Plaintiffs declined to obtain any evidence from FDA about what the agency "would have" done had it known of Merck's alleged misrepresentations and, in any event, Dr. Kessler's submission to FDA means that FDA now knows what Plaintiffs say were misrepresentations that led FDA not to require a label change. But FDA has not requested that Merck make any changes to its label. Such continued inaction in the face of FDA's statutory duty to act when it learns information that materially affects the accuracy of vaccine labels is conclusive evidence that FDA *would not* have required Merck to change its labels in the but-for world and therefore that FDA *would not* have granted GSK a license any sooner than it did. No reasonable jury could conclude otherwise.

## ARGUMENT

## I. MERCK'S STATEMENTS TO FDA ARE IMMUNE FROM ANTITRUST LIABILITY UNDER *NOERR-PENNINGTON*.

The First Amendment guarantees the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Supreme Court has long

recognized that for this clause to meaningfully protect that right, persons must be immune from liability for their efforts to persuade government officials to perform their functions a certain way.  Thus, in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, the Court held that railroads were immune from antitrust liability for their lobbying campaign to persuade Pennsylvania to adopt legislation that would severely limit competition from truckers.  365 U.S. 127, 129, 133, 138 (1961).  In *United Mine Workers v. Pennington*, the Court extended antitrust immunity to activities aimed at the executive branch.  381 U.S. 657, 669-670 (1965).

The *Noerr-Pennington* doctrine, as it is now known, "includes two distinct types of actions."  *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 251 (3d Cir. 2001).  "A petitioner may be immune from the antitrust injuries which result from the petitioning itself," as well as "from liability arising from the antitrust injuries caused by government action which results from the petitioning."  *Id.* (citing *Noerr*, 365 U.S. at 143; *Pennington*, 381 U.S. at 671).

Plaintiffs contend that Merck engaged in anticompetititve conduct by making misleading statements to FDA about the ability of its vaccine to maintain the labeled potency level through end-expiry in responding to a Form 483 and the

February 2001 Warning Letter, and in two BPDRs.[5]  Plaintiffs say these statements were an effort to keep GSK from obtaining approval of a competing vaccine.

The District Court correctly concluded that "Merck's submission[s] to the FDA" constituted sufficient "petitioning activity."  Appx75.  It nonetheless denied summary judgment because, in its view, "genuine issues of material fact remain[ed]" relating to the three submissions that Plaintiffs had argued fell within the "sham" exception to *Noerr-Pennington*.  Appx76.

That was error, for three reasons.  *First*, petitioning activity that is genuinely intended to influence governmental action—meaning that is not an objectively baseless position taken to impede a competitor—is outside the sham exception, as the Supreme Court and this Court have repeatedly held.  *Second*, when such petitioning activity exists, courts do not engage in a debate about whether it could be said to contain misstatements or omissions, particularly in a non-adjudicatory context.  *Third*, the parties' disagreement on whether Merck's submissions in fact contained misrepresentations or omissions does not create a triable issue as to the

---

[5]   As noted above, *supra* pp. 8-9 & n.3, FDA knew and approved the release potency of every lot and Merck told FDA what it anticipated the average end-expiry potency would be for all lots that were approved for release by FDA prior to the 1999 release-potency increase.  The BDPRs subsequently reported data to FDA about certain pre-increase lots that did in fact fall below the labeled potency.

sham exception, because any such misrepresentations or omissions would not turn Merck's petitioning activity here into a sham as a matter of law.

**A.  Merck's FDA Submissions Do Not Implicate The Sham Exception As Defined By The Supreme Court And This Circuit.**

*Noerr-Pennington* immunity has a narrow exception for "sham" petitioning activity. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991). Sham petitioning is activity "ostensibly directed toward influencing governmental action" but that is really an attempt to "directly" interfere with a competitor by taking an objectively baseless position for the purpose of impeding that competitor. *Id.* (quoting *Noerr*, 365 U.S. at 144). "A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Id.*

Put another way, sham petitioning activity is an attempt to restrain trade by abusing the "process" rather than a genuine effort to secure favorable relief from the government. *Id.* So the sham inquiry is about the propriety of the invocation of the "process" of petitioning, not whether a party failed to achieve the "outcome" it sought. *Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.* (*PRE*), 508 U.S. 49, 61 (1993) (citation omitted). An objectively baseless petition is outside of *Noerr-Pennington* immunity because it has no colorable possibility of success. Put colloquially, it is petitioning undertaken solely to gum up the works.

Colorable petitioning activity is immune from antitrust liability as valid petitioning conduct regardless of whether it ultimately succeeds, because not all petitioning is successful. *E.g.*, *Omni*, 499 U.S. at 381 (petitioning activity to secure zoning ordinance not a sham because it was a colorable attempt to convince the government to pass the ordinance, even though the ordinance would disrupt competitor's business); *Wellbutrin*, 868 F.3d at 148 ("[T]he essential question is not whether [a petition] succeeds, but whether [it] was a sham at the time it was filed.").

Plaintiffs do not contend, and of course have no evidence to suggest, that their asserted injury flows "directly" from an abuse of *process* by Merck. *Omni*, 499 U.S. at 381. Nor could they suggest that a company engages in an abuse of process *by responding to* a Form 483 or Warning Letter from FDA, or by submitting BPDRs when the company has an obligation to report a deviation or an unexpected event in manufacturing. By submitting those materials, Merck provided appropriate and responsive information that supported Merck's position that no action by FDA was warranted. FDA agreed with Merck.

Plaintiffs' real dispute here is with the outcome of those submissions—that FDA did not conduct a recall, request a label change, or otherwise somehow act to lower the bar for GSK. But applying the sham exception to a situation where one party claims to be harmed by the outcome of petitioning submitted to achieve a

governmental result would "distort[] its meaning and bear[] little relation to the sham exception *Noerr* described to cover activity that was not genuinely intended to influence governmental action." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 n.10 (1988) (citing *Noerr*, 365 U.S. at 144).

This Court's decision in *Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154 (3d Cir. 1999), highlights the problems with Plaintiffs' theory. There, the plaintiff applied for a Certificate of Need from Pennsylvania's Department of Health to build an outpatient surgery center. During a hearing on the application, a nearby hospital and its physicians testified—falsely—that the hospital had already begun constructing its own outpatient surgery center, so the community had no need for the plaintiff's center. *Id.* at 156. The Department denied the plaintiff's building application, in part because of that misrepresentation, and the plaintiff brought an antitrust suit.

This Court held that the plaintiff's alleged injuries were "a direct result of the Department's decision" and that antitrust liability could not be imposed under *Noerr-Pennington*. *Id.* at 160. It rejected the plaintiff's argument that *Noerr-Pennington* immunity should be unavailable because the defendant had "us[ed] information known to be false." *Id.* As the Court explained: "Liability for injuries caused by such state action is precluded even where it is alleged that a private party

30

urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process." *Id.* at 162.

Not only is application of the sham exception based on Plaintiffs' arguments here foreclosed by *Armstrong*, but when petitioning activity successfully achieves its aim, courts hold it is not the sort of sham invocation of process exempt from *Noerr-Pennington*. *See Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 161 (3d Cir. 1984) (no antitrust liability where "plaintiffs' success on the merits of their copyright infringement action demonstrates clearly that plaintiffs possessed valid causes of action under the copyright laws"); *PRE*, 508 U.S. at 55 n.3 (collecting circuit cases that "held that successful litigation by definition cannot be sham"); *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1063 (9th Cir. 1998) ("we must conclude that a victory before the Department necessarily indicates that NWK's position was not objectively baseless").

Plaintiffs have never disputed that Merck was successful here in its petitioning of FDA—nor could they. FDA, in its discretion and based on its analysis, took no action against Merck after the Form 483, Warning Letter, or BPDRs. These petitions are immune as a matter of law.

**B.** **Plaintiffs' Claims About Misrepresentations In Merck's Submissions To FDA Do Not Affect The Application Of *Noerr-Pennington* Because The FDA Process Was Non-Adjudicatory.**

Plaintiffs may seize on the fact that two courts of appeals have held that in the context of an adjudicatory proceeding, fraudulent misrepresentations can take petitioning outside of *Noerr-Pennington*'s immunity. *See U.S. Futures Exch., L.L.C. v. Board of Trade of the City of Chicago, Inc.*, 953 F.3d 955, 960 (7th Cir. 2020); *Kottle*, 146 F.3d at 1060 (9th Cir.). Those holdings are consistent with the suggestion in *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972), that misrepresentations may not be "immunized when used in the adjudicatory process."

None of Merck's submissions were made as part of an adjudicatory proceeding. An agency process is *legislative*—as opposed to *adjudicatory*—where there are no "strict rules of relevance and admissibility," where the governmental action is a matter "of discretionary authority," where the process is "subject to lobbying and other forms of ex parte influence," and where statements are not made under a "penalty of perjury" that would signal a witness "is not 'at liberty to exaggerate or color his version of an event.'" *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 845-846 (7th Cir. 2011) (citations omitted); *see also Kottle*, 146 F.3d at 1062 (whether agency proceeding is adjudicative depends on whether decision was "discretion[ary]," whether agency "issue[d] written findings," and

32

whether agency's actions were "guided by enforceable standards subject to review").

The difference in the two contexts matters. For starters, courts can more readily decipher the impact of a misrepresentation when it was made in an adjudicatory proceeding governed by preset evidentiary rules and legal standards. *Kottle*, 146 F.3d at 1062; *Mercatus*, 641 F.3d at 848. And it would raise "significant constitutional concerns" to chill or discourage regulated entities from communicating with an agency about discretionary agency decisions, at the risk of potentially facing treble antitrust damages if those communications are later held to be outside of *Noerr-Pennington*'s protection. *Mercatus*, 641 F.3d at 846-847.

This Court's decision in *Cheminor Drugs, Ltd. v. Ethyl Corporation*, 168 F.3d 119 (3d Cir. 1999), supports Merck's position. There, one company filed a petition with the International Trade Commission (ITC) accusing another company of violating anti-dumping laws, and the ITC preliminarily granted the petition. The defendant in the ITC action later filed an antitrust suit alleging that the ITC-plaintiff "gave the ITC inaccurate information," which had caused the ITC to find a material injury. *Id.* at 120, 124-125. This Court looked to the terms of the governing anti-dumping statute and the agency's written "findings" to conclude that the ITC had not based its determination on that supposedly inaccurate information. *Id.* at 127. As the Court recognized, this type of inquiry would at

33

best be impracticable when reviewing unstructured, discretionary agency decision-making. It thus "declin[ed] to carve out a new" standalone exception for material misrepresentations and instead confined its inquiry to whether the company's petition "was objectively baseless under the Supreme Court's test in *PRE*, without regard to" the allegedly misrepresented facts. *Id.* at 123.

*Cheminor*, like *Armstrong*, is rooted in this Court's adherence to the same basic principles that led the Seventh and Ninth Circuits to hold that misrepresentations can only potentially be outside of *Noerr-Pennington* in an adjudicatory setting. On the front end, when an agency acts in an adjudicative role, it typically applies pre-determined standards without its own investigation of the facts; on the back end, a court reviewing a written adjudicatory decision can easily determine whether a misrepresentation was in fact "material" to the agency's judgment. *Id.* at 124. The Court should decline any invitation Plaintiffs might propose for a new misrepresentation exception to *Noerr-Pennington* applicable in non-adjudicatory proceedings.

Merck's submissions here were not made as part of any adjudicatory proceeding. FDA "did not compile an evidentiary record through formal proceedings and was free to base its actions on information and arguments that come to it from any source." *Mercatus*, 641 F.3d at 845 (quotation marks omitted). There was no formal hearing or written decision. And FDA's actions

34

were not "guided by enforceable, definite standards subject to review." *Id.* at 848. Rather, as the District Court held, the agency's decisions were strictly a matter of its "discretion[ary]" judgment. Appx76. With neither a written decision by FDA nor a precise statutory framework for FDA's determinations, courts and juries are ill-equipped to determine whether the alleged misrepresentations were "material" to FDA's decisionmaking. *Cheminor*, 168 F.3d at 124.

The record here showed that FDA did not merely "rel[y] on the representations" made by Merck, but instead conducted its own "active[]" and "independent review" of "each of the submissions" and engaged in an extensive "back-and-forth" with Merck. Appx75-76. That should have been the end of the inquiry. *See Armstrong*, 185 F.3d at 164 & n.8 (highlighting that the state agency made its own "factual determinations" and did not "depend[]" on the representations made by the "financially interested" parties).

But there is even more here. The alleged misrepresentations or omissions could not have been material because Dr. Kessler detailed to FDA why he (and Plaintiffs) think Merck's statements were inaccurate and urged FDA to take action. But, more than four years later, FDA has taken no action in response. Appx171; *see supra* pp. 19-21. As the District Court explained, because FDA has "a duty to review the information" before it, its "lack of response … strongly indicate[s] that Relators' allegations are not material." Appx171; *see also* 21 U.S.C.

§ 355(o)(4)(A) (requiring FDA to initiate label change based on newly available safety and efficacy data); *cf. Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1684 (2019) (Alito and Kavanaugh, J.J., and Roberts, C.J., concurring in the judgment) ("[I]f the FDA declines to require a label change despite having received and considered information regarding a new risk, the logical conclusion is that the FDA determined that a label change was unjustified."). Under *Cheminor*, such non-material statements cannot give rise to a cognizable antitrust claim. 168 F.3d at 124 (only "a *material* misrepresentation that affects the very core of a litigant's … case will preclude *Noerr-Pennington* immunity").

### C.   No Disputed Issues Of Material Fact Precluded Summary Judgment For Merck.

The District Court denied summary judgment on the basis that the "predicate facts" of the underlying petitioning activity were not undisputed. Appx76 (citation omitted). The court seemed to view the "predicate facts" as what Merck's FDA submissions *should have* said, and therefore was concerned that it could not grant summary judgment if the parties disagreed on that score. But Merck had explained that the court did not need to resolve whether there were in fact any misrepresentations because the sham exception to *Noerr-Pennington* would not apply regardless.

The "predicate facts" language comes from the Supreme Court's decision in *PRE*. The Court's ultimate holding in that case was that the lower courts had

correctly found that probable cause existed for the copyright suit later asserted to be a sham.  *See* 508 U.S. at 63.  In reaching that conclusion, the Court explained that "[w]here, as here, there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause as a matter of law."  *Id.* Citing that statement, this Court in *Wellbutrin* explained that "the predicate facts" are "the contents" of the petitioning activity, and that it is a "legal question" for the court whether those undisputed contents are sufficient to show objective baselessness.  *See* 868 F.3d at 151.

Here, as a legal matter, no reasonable jury could have found that Merck's submissions were an abuse of process undertaken to harm GSK with no possible hope of succeeding in avoiding FDA action.  *See supra* pp. 28-31.

Finally, the District Court incorrectly found that potential inaccuracies in Merck's statements to the public in the form of its mumps-vaccine label precluded summary judgment.  Appx78-79.  Merck is aware of no antitrust case that has proceeded to trial based on an argument that FDA-approved statements in a drug's FDA-approved label unlawfully harmed competition, let alone in a case where FDA has continued to stand by the label even after a former FDA Commissioner alerted FDA to the alleged inaccuracies in that label.  Indeed, in light of the fact that FDA has determined to leave the label as-is in the face of its statutory responsibility to correct the label "promptly" had the agency agreed with Dr.

Kessler's detailed submissions, Plaintiffs' unprecedented label-based claim is foreclosed: Merck's public statements are conclusively *not* false, let alone false in a way that frustrated competition.

## II. THE DISTRICT COURT SHOULD HAVE GRANTED SUMMARY JUDGMENT TO MERCK BECAUSE PLAINTIFFS LACK SUFFICIENT EVIDENCE TO CREATE A TRIABLE ISSUE ON ANTITRUST INJURY.

The summary-judgment record showed another shortcoming in Plaintiffs' evidence, which entitled Merck to summary judgment for a second, independent reason: Plaintiffs lacked sufficient evidence to create a triable fact on causal antitrust injury. Every antitrust plaintiff "must prove antitrust injury, which is … injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants acts' unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Antitrust plaintiffs thus must show a "causal connection between the purportedly unlawful conduct and [their] injury." *City of Pittsburgh v. W. Penn. Power Co.*, 147 F.3d 256, 265 (3d Cir. 2017). This is a "necessary" element of every antitrust claim, *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997), "that can be resolved at summary judgment," *Wellbutrin*, 868 F.3d at 164.

Plaintiffs' theory depended on them developing evidence that Merck's alleged anticompetitive conduct caused a delay in when GSK entered their alleged mumps-vaccine market, which caused them to pay higher prices for the mumps

vaccine.  In this context, causation evidence means evidence that GSK "was willing and able to supply" its competing vaccine sooner "but for" Merck's "exclusionary conduct."  *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 862 (D.C. Cir. 2008) ("[A] would-be purchaser suing an incumbent monopolist for excluding a potential competitor from which it might have bought a product at a lower price must prove the excluded firm was willing and able to supply it but for the incumbent firm's exclusionary conduct." (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328. 334 (1990))).

No reasonable jury could find this standard met.  *First*, GSK identified five specific factors that drove the timing of Priorix's development and licensing— none of which was GSK's inability to mirror the allegedly inflated statements on Merck's label.  *Second*, even if those supposedly inflated statements on Merck's label had played a role in GSK's development plans—contrary to GSK's testimony in this case—Plaintiffs lack any evidence that the statements would have changed how FDA evaluated GSK's license for Priorix or that FDA would have approved the Priorix license any sooner than it did.  Not only that, real-world events conclusively show that FDA *would not* have required Merck to take any action and thereby "lower the bar" for GSK; FDA has long known of Plaintiffs' specific allegations and their evidence and—despite having a statutory duty to act if it learns of material new information—has not required Merck to change its label.

**A. Plaintiffs Lack Evidence That Merck's Alleged Misconduct Caused GSK To Enter The Mumps-Vaccine Market At A Later Time Than It Would Have Otherwise.**

Plaintiffs come nowhere close to showing "that the harm they say they experienced—increased drug prices—was caused by the [alleged anticompetitive conduct] they are complaining about." *Wellbutrin*, 868 F.3d at 164-165 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969)). Plaintiffs have *no evidence* that GSK was delayed in releasing Priorix to the market because of its inability to mirror Merck's mumps-vaccine label. Quite the opposite: The record is clear on the precise reasons that GSK entered the market when it did—and none of them involve Merck's label.

This lack of evidence is a "telling blow" to Plaintiffs' theory and "weighs heavily against" the viability of their antitrust claim. *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir. 1986). GSK's corporate representative expressly testified that there was no statement on Merck's label "that foreclosed GSK from commercializing the mumps vaccine in the United States." Appx564; *accord id.* (deposition page 169, lines 7-11) GSK's testimony on this point is unsurprising. GSK derived the strain of mumps used in its vaccine from the strain used in Merck's vaccine. Appx566. GSK did not view its vaccine as being different from Merck's vaccine. *Id.* And GSK conducted Phase II clinical studies in the mid-

2000s that showed its mumps vaccine was non-inferior to Merck's mumps vaccine. Appx568.

GSK's unequivocal denial that any statements on Merck's label affected the timing of its entry into the market should have ended this antitrust case. If nothing on Merck's label delayed GSK's entry, then none of Merck's alleged misrepresentations to FDA concerning that label had anything to do with the timing of GSK's market entrance. The record contradicted Plaintiffs' claim of "a causal link between" Merck's alleged anticompetitive conduct and their injury, *Sound Ship Bldg. Corp. v. Bethlehem Steel Co. (Inc.)*, 533 F.2d 96, 98 (3d Cir. 1976), which should have resulted in summary judgment for Merck. *See id.* at 98-99 (affirming grant of summary judgment where record showed the plaintiffs' "losses were not caused by action on the part of" the defendant); *Wellbutrin*, 868 F.3d at 166 (similar); *Chandler v. Phoenix Servs., L.L.C.*, 45 F.4th 807, 814-815 (5th Cir. 2022) (similar).

GSK's corporate representative went further and identified five specific reasons that GSK launched its competing vaccine in 2022 and not at an earlier point in time. Those reasons included GSK's overall business strategy of focusing on adult vaccines, budget concerns, profitability concerns, uncertainty about whether a trivalent vaccine would be competitive with a quadrivalent vaccine already on the market (Merck's ProQuad), ███████████████████████

41

███████████████████████████████████

███████ *See* Appx402; Appx1055-56; Appx563-564; Appx558-559.  As the

District Court detailed them:

> 1.  GSK deprioritized development of mumps-containing vaccines for business reasons, including budgetary concerns and opportunities with other products more in line with GSK's business strategy of focusing on adult vaccines;
>
> 2.  GSK was concerned that Priorix sales would be low;
>
> 3.  GSK did not actively pursue Priorix prior to 2009 because it believed that the market would shift from MMR [trivalent] to MMRV [quadrivalent] vaccines;
>
> 4. But then GSK did not pursue a MMRV vaccine either, ████████ ████████████████████████████████████████████ ███████ ; and
>
> 5.  GSK believed a mumps-containing vaccine would have a qualitative, but no quantitative, impact on its overall product portfolio.

Appx22.  This list of factors was unequivocally exhaustive:  "GSK stated that there

were no other reasons that GSK was not on the market with a mumps-containing

vaccine" at a point earlier than 2022.  *Id.*

GSK's testimony confirms that Plaintiffs cannot prove a causal link between

Merck's alleged conduct and Plaintiffs' injury.  Antitrust plaintiffs cannot show the

requisite level of causation as a matter of law where "numerous intervening

economic and market factors … may have been the actual cause of [their]

injuries."  *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391,

402 (7th Cir. 1993); *see also, e.g.*, *Spartan Concrete Prods., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 114 (3d Cir. 2019) (affirming directed verdict where "the evidence … showed" that the plaintiffs' injury was caused by "reasons unrelated to the" alleged anticompetitive conduct); *J.B.D.L. Corp. v. Wyeth-Ayerst Lab'ys, Inc.*, 485 F.3d 880, 890 (6th Cir. 2007) (affirming grant of summary judgment where plaintiffs could not "account for the numerous alternative explanations for" their injury); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495-96 (8th Cir. 1992) (similar). Here, the record contains more than factors that "*may* have" explained GSK's delay; it contains GSK's definitive and exhaustive testimony as to the specific factors that *in fact* explain the timing of its market entry.

In light of this definitive evidence from GSK about what did and did *not* cause its delay, no reasonable jury could conclude that Merck's alleged misconduct caused Plaintiffs' injury.

The District Court identified three pieces of evidence that led it to find a triable fact on this issue: (1) "evidence that GSK had protracted discussions with the FDA on the serological acceptability criteria for mumps" and completed its Phase III clinical trials only after the same ELISA assay that Merck had used in Protocol 007 became commercially available; (2) internal Merck documents "stating that they were out of compliance" but did not want to change the label because doing so would make it easier for GSK to develop a competing product;

and (3) the fact that GSK entered the market according to the timeframe Plaintiffs' expert predicted it would. Appx80-81. None of this suffices to create a triable fact for a straightforward reason: None of it connects Merck's alleged misrepresentations to FDA to the timing of GSK's market entry—the critical causation question.

First, the document noting GSK's "protracted" discussions with FDA on "the serological acceptability criteria" and GSK's reliance on Merck's ELISA is a single 2015 email from a GSK medical officer to GSK's Chairman of Vaccines in preparation for an investor event. Appx3381. In 2018, after GSK's corporate representative testified about the five and only five reasons that factored into the timing of Priorix's development and release—which did not include "protracted" discussions with FDA—Plaintiffs did not ask that representative about this document, much less a question that would demonstrate a connection between the discussions GSK was having with FDA and Merck's alleged misstatements to FDA. After all, the record shows that the response rate that FDA required GSK to meet—"response rate ≥ 90%," *id.*— is the *same* response rate FDA required that Merck meet in Protocol 007, *see supra* p. 10. GSK's difficulties meeting that requirement until it had access to the same ELISA assay Merck used shows, if

anything, that GSK struggled to design on its own an ELISA assay with the sensitivity that FDA required.[6]

Especially when viewed against GSK's unequivocal testimony about why it entered the market when it did, no reasonable jury could find that this document shows Merck contributed to the timing of Priorix's market entry. Any conclusion otherwise would be "an inference based upon a speculation or conjecture" and insufficient "to defeat [entry of] summary judgment." *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (citation omitted).

Second, any "internal document" in the record suggesting that Merck did not want to change the label because that "would allow GSK to enter the market," Appx80, is just that—an internal document. Documents that never left Merck cannot show a triable question of fact on whether *GSK* would have entered the market earlier absent Merck's alleged misconduct. And, in any event, GSK's unequivocal testimony proved Merck's internal concerns to be unfounded: GSK did *not* view any statement on Merck's label as affecting the timing of Priorix's development.

---

[6]   To be clear, there is no allegation in this case that Merck improperly withheld access to its ELISA; that assay instead became available to GSK when the "lab was purchased by an independent research company." Appx66.

Third, it is unclear how Plaintiffs' expert's "predict[ion]" about GSK's market entry "once it received access" to Merck's ELISA is evidence that Merck's alleged misconduct played any role. Appx81. Plaintiffs' allegations go to Merck's alleged misconduct *before* GSK had access to that test; everything that happened after GSK obtained access to the ELISA was between GSK and FDA.

The District Court also suggested that the five—and only five—factors GSK expressly testified had affected its timing still might not "break the causal connection" because GSK also testified that it "had to mirror Merck's allegedly false label claims." *Id.* But that's just it: GSK pursued licensure by mirroring Merck's label and testified that *nothing on that label* affected the timing of its market entry. In fact, GSK testified that, even in the Phase II trials that did not rely on Merck's ELISA, GSK *did* demonstrate that its mumps vaccine was non-inferior to Merck's. Appx568. Far from creating a genuine dispute on causation, this testimony confirms the absence of one.

**B. Plaintiffs Cannot Show That FDA, Had It Known Of Merck's Alleged Misrepresentations, Would Have Granted GSK A License Sooner Than 2022.**

Even if Plaintiffs had evidence that the timing of GSK's launch of Priorix was driven by its inability to mirror Merck's label (and they don't), Plaintiffs cannot show, as required by this Circuit's precedent, that had FDA known of Merck's alleged misrepresentations, FDA would have granted GSK a license any

sooner than it did.  The District Court summarily asserted that "the actions taken by FDA … are foreseeable consequences of Merck's alleged misconduct." Appx81.  But given that Plaintiffs adduced no evidence from FDA as to what FDA would have done absent Merck's alleged misconduct—much less that FDA would have granted GSK a license sooner than it did—the District Court's statement is unsupported.[7]  Moreover, in 2019, Plaintiffs' expert Dr. Kessler told FDA all about Merck's alleged misrepresentations, and the agency did not require Merck to change a thing about its label, notwithstanding the statutory duty it owed to require such a change *promptly* if it agreed with Dr. Kessler.  GSK would therefore have had to mirror the same label in the but-for world that it had to mirror in the real-world, meaning that any delay caused by its failure to mirror that label would have

---

[7]    Plaintiffs may point to their proffered expert, Dr. Thomas L. Copmann, who opined that if Merck had revised the label for its mumps vaccine, "[t]his would have *likely resulted in the FDA taking a more flexible approach in reaching an agreement with GSK on an appropriate serological assay* to demonstrate how well Priorix protected children from disease."  Appx1546 (emphasis added).  Even setting aside that it is clear today FDA would *not* have required any revision to Merck's label (because those statements remain on the label today), Dr. Copmann's view that there would "likely" have been "a more flexible approach" by the agency is not evidence that Plaintiffs could use to demonstrate the governing standard from *Wellbutrin*.  As discussed, *infra* pp. 48-50, *Wellbutrin* requires evidence that FDA "would have" granted GSK a license to market Priorix sooner.

been the same no matter Merck's alleged misrepresentations. Those alleged

misrepresentations therefore cannot have caused Plaintiffs' injury.

> 1. *To show antitrust injury, Plaintiffs must establish that FDA would have granted GSK a license sooner than it did.*

It is well-established that "[a] regulatory or legislative bar can break the

chain of causation" and preclude plaintiffs from showing antitrust injury.

*Wellbutrin*, 868 F.3d at 165 (citing, *e.g.*, *In re Canadian Imp. Antitrust Litig.*, 470

F.3d 785 (8th Cir. 2006) (plaintiff faced higher drug prices because federal law

prevented importation of cheaper Canadian drugs); *City of Pittsburgh*, 147 F.3d at

265 (plaintiff suffered injury because of "realities of the regulated environment")).

Indeed, as the Supreme Court has explained, "[a]ntitrust analysis must always be

attuned to the … significance of regulation" in the industry at issue. *Verizon*

*Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 411 (2004).

Thus, where regulatory approval is a prerequisite to entering the market, "[i]n

order to withstand summary judgment," plaintiffs must "produce evidence from

which a reasonable jury could conclude that it is more likely than not that [the

competitor] *would have* obtained" that regulatory approval absent the challenged

conduct. *Wellbutrin*, 868 F.3d at 167 (emphasis added).

This "would have" standard is strict. Take, for example, *Wellbutrin*.

Generic-drug manufacturers sought FDA authorization to market a generic version

of a branded drug that was, according to the branded-drug manufacturer, covered

by a patent.  In response, the branded-drug manufacturer entered into a settlement, in which the branded-drug manufacturer allegedly agreed to not launch its own generic version for several months and, in return, the generic-drug manufacturers allegedly agreed to delay their own launch of a generic version.  *Id.* at 146, 162.  Purchasers then sued the branded-drug manufacturer for engaging in an alleged conspiracy in violation of the antitrust laws.  *Id.* at 146.

This Court affirmed the district court's entry of summary judgment in favor of the defendant on the ground that the plaintiffs could not show antitrust injury.  As this Court explained, "[i]t is not enough … to show that [the generic-drug manufacturer] wanted to launch its drug; [plaintiffs] must also show that the launch would have been legal."  *Id.* at 165.  And because the generic drug "was effectively blocked by federal patent law," the plaintiffs could not make that showing.  *Id.*  The plaintiffs' injury was thus "caused not by the settlement but by the patent laws prohibiting the launch."  *Id.*

The *Wellbutrin* plaintiffs tried to avoid this reality by arguing that, "but for the challenged agreements," the generic manufacturer would have been able to "obtain[] a license to [the] patent" and thereby enter the market.  *Id.* at 166.  But this Court rejected the plaintiffs' evidence on this point as "speculation."  *Id.* at 167.  "Evidence showing that [the generic manufacturer] *may* have been able to obtain a license" is not enough; plaintiffs must instead "produce evidence from

which a reasonable jury could conclude that it is more likely than not that [the generic manufacturer] *would* have obtained a license." *Id.* at 167; *see also In re Mallinckrodt PLC*, 638 B.R. 57, 72-75 (D. Del. 2021) (concluding FDA's "regulatory barrier broke the chain of causation" and that plaintiffs "were unable to prove that the harm they experienced was connected to and in fact caused by the Debtors' alleged anticompetitive conduct").

The D.C. Circuit reached a similar conclusion based on similar reasoning in *Meijer*. That case concerned the allegation that a branded-drug manufacturer falsely claimed that its patent covered a generic version, which had the effect of delaying FDA's approval of that generic version. *See* 533 F.3d at 859. The D.C. Circuit explained that to survive summary judgment on antitrust injury, the plaintiffs needed evidence showing that, "but for … the alleged misuse of the … patent, FDA *would have* granted [the generic manufacturer] final approval" sooner than it did. *Id.* at 862 (emphasis added). After combing through the record, the court concluded that "the plaintiffs have not adduced evidence sufficient for a reasonable juror" to make that finding, and accordingly affirmed the district court's grant of summary judgment in favor of the defendants. *Id.* at 865.

> 2. *Plaintiffs cannot show that FDA "would have" granted GSK a license sooner than it did.*

For two reasons, Plaintiffs cannot show that FDA, had it known of Merck's alleged misrepresentations, "would have" granted GSK a license sooner than it did.

*First*, Plaintiffs have no evidence from FDA that Merck's conduct affected FDA's decision-making with regards to GSK's vaccine. Plaintiffs sought no discovery from FDA. Because of this litigation decision, Plaintiffs lack any evidence of what FDA would have done had it learned of Merck's alleged misrepresentations, much less evidence that FDA "would have" granted GSK a license any sooner than it did. *Wellbutrin*, 868 F.3d at 167. Because this is a required causal link between Merck's alleged misconduct and Plaintiffs' injury, *see id.*; *Meijer*, 533 F.3d at 862, Plaintiffs' failure to show this link means that no reasonable jury could conclude that Plaintiffs' injury was caused by Merck's alleged misconduct, as opposed to FDA's "regulatory scheme." *Wellbutrin*, 868 F.3d at 166; *see also Meijer*, 533 F.3d at 865.

*Second*, real-world events have since disproved the core of Plaintiffs' causation theory: that, had FDA known of Merck's alleged misrepresentations, FDA would have required Merck to change its label in a way that would have made it easier for GSK to mirror and thereby secure a license.

At the threshold, FDA was aware of the facts underlying many of Plaintiffs' concerns with Merck's label *in real time*. At summary judgment, Plaintiffs contended that Merck failed to report to FDA certain lots whose potency was projected to fall below the end-expiry potency statement. Appx58. But Merck told FDA that the "expected *average* potency at expiry" for *all* lots that were released

51

to the market before Merck increased the release potency would fall below the labeled end-expiry potency statement. *See id.* (citation omitted) (emphasis added); *see also supra* p. 8. FDA did nothing in response.[8] Plaintiffs also complained about the particular strain of the virus used in the Protocol 007 PRN, as well as Merck's use of anti-IgG. *See* ECF 295 at 24-25. FDA approved both of those decisions, and in fact was the one that recommended that Merck use anti-IgG in the first place. *See supra* p. 10. Plaintiffs finally highlighted Merck's alleged lab fraud. *See* ECF 295 at 25-26. But FDA knew of those allegations, conducted an in-depth investigation in response, and ultimately allowed Merck to support its applications with the original data from the allegedly falsified records. *See supra* pp. 10-11. Despite being aware of all of this, at no point did FDA even suggest that Merck change other statements on its label.

Moreover, there is no need to speculate as to what FDA *would have done* had it known of the alleged misrepresentations; we already know: FDA would not have changed a single statement on Merck's label.

---

[8]   Plaintiffs also pointed to one internal model predicting that even with the 1999 release-potency increase, 7% of lots of the vaccine would not meet the required potency through end-expiry. *See* ECF 295 at 20. That model proved inaccurate. Merck's stability testing of post-release-potency-increase lots showed that the vaccine maintained the required potency level through end-expiry. KrahlingAppx16370-71.

In October 2019, Plaintiffs' expert Dr. Kessler, a former FDA Commissioner, submitted to the head of FDA his views of what the discovery record in this case showed: a "significant public health concern" requiring changes to Merck's mumps-vaccine label. KrahlingAppx15619-21. Dr. Kessler's submission discussed the same exact alleged misrepresentations Plaintiffs relied upon at summary judgment to show that Merck engaged in misconduct.

Like Plaintiffs, Dr. Kessler highlighted that a Merck employee referred to certain lots released to the market before the 1999 release-potency increase as "sub-potent" and a "compliance issue." KrahlingAppx15607-08 (citing an email from Dr. Margolskee); *see* ECF 295 at 18 & 7 n.18 (citing same document).

Like Plaintiffs, Dr. Kessler noted that, in response to FDA's February 2001 Warning Letter, Merck "did not disclose … that there were 225 lots of vaccine with 'low mumps potency' still within the expiry period at the time." KrahlingAppx15610 (footnote omitted); *see* ECF 295 at 19-20.

Like Plaintiffs, Dr. Kessler alerted that Merck "did not disclose the 225 lots of vaccine with 'low mumps potency' in two Biological Deviation Reports made in March and April 2001." KrahlingAppx15610; *see* Appx59; ECF 295 at 20.

Like Plaintiffs, Dr. Kessler discussed an internal Merck document suggesting that Merck did not want to shorten the vaccine's shelf-life because

doing so would make the product "non-marketable."  KrahlingAppx15615; ECF 295 at 16-17 & n.80 (citing same document).

And like Plaintiffs, Dr. Kessler relied on the deposition testimony of two former Merck employees involved in Protocol 007 to caution FDA that the study was not designed to study protection, "and therefore the results of the [PRN] assay could not be used to provide reliable information about the effectiveness of" the vaccine.  KrahlingAppx15616; ECF 295 at 27-28 & 29 n.154 (pointing to same deposition testimony).

Dr. Kessler concluded his submission by recommending, among other things, "[r]evising the labels for Merck's mumps-containing vaccines to accurately reflect what is known about how well this vaccine is actually working today." KrahlingAppx15619.

FDA had a duty to review this information and to "notify the responsible person" if it "becomes aware of … new safety information or information related to reduced effectiveness, that [FDA] determines should be included in the labeling of the drug."  21 U.S.C. § 355(o)(4)(A); *see also Advanced Disposal Servs. E., Inc. v. N.L.R.B.*, 820 F.3d 592, 604 (3d Cir. 2016) (discussing presumption of regularity).  But in the four-plus years since Dr. Kessler submitted his report to the head of FDA, FDA has done nothing—much less require Merck to change the statements on the label.

FDA's continued inaction in the face of its statutory duty to act can mean only that the agency does not consider the label statements to be misleading, regardless of Merck's alleged misrepresentations. It necessarily follows that FDA would not have required Merck to change its label in the but-for world, meaning that any delay GSK experienced in seeking licensure because of its inability to mirror Merck's label *would have been the same* in the but-for world as it was in the real world. Thus, even if FDA knew about Merck's alleged misrepresentations, FDA *would not have* granted GSK a license any sooner than it did. Like the plaintiffs in *Wellbutrin* and *Meijer*, Plaintiffs therefore cannot show that Merck's alleged anticompetitive conduct, as opposed to FDA's independent decision-making regarding the sufficiency of GSK's vaccine, caused Plaintiffs' injury.

Dr. Kessler's submissions follow the government's intimate involvement in discovery in the FCA case, which is closely related to this one. As the District Court recognized, "Plaintiffs' case arises from the same underlying allegations of fraud that spawned the related False Claims Act … case." Appx50. The District Court consolidated the cases and issued a joint discovery order. *See* ECF 23; ECF 70; Appx112. That joint order led to the production of the *same* Merck and GSK documents—many of which were attached to the summary-judgment briefing in both the FCA case and this one. And because the Department of Justice (DOJ) was copied on all submissions in the FCA case, DOJ has had access to Plaintiffs'

evidence about Merck's alleged misrepresentations since October 2019.  And still

FDA has done nothing to require any change to Merck's mumps-vaccine label.

CDC has also been made aware of the allegations underpinning Plaintiffs'

case.  In the FCA case, several high-ranking CDC officials were deposed during

discovery, and three CDC employees were authorized to serve as expert witnesses

for Merck.  *See* KrahlingAppx215-216.  Had CDC learned of anything that it

concluded undermined the accuracy of Merck's label during these proceedings, it

had a duty to notify FDA "as soon as reasonably practicable."  *See* Memorandum

of Understanding Between the Food and Drug Administration and the Centers for

Disease Control and Prevention 225-14-017 § III(A)(3) (amended June 30, 2023),

https://www.fda.gov/about-fda/domestic-mous/mou-225-14-017 ("Each agency

will notify the other agency as soon as reasonably practicable when issues of

mutual concern become evident.").[9]

In short, FDA—and the government more broadly—is well aware of all the

facts underpinning Plaintiffs' claim that Merck misrepresented its vaccine.  This is

thus the rare case where there is no doubt about what would have happened in a

---

[9]  This memorandum of understanding was in effect when CDC authorized the deposition testimony of its employees in 2017 and 2018.  *See* KrahlingAppx1946, KrahlingAppx1951 (letters authorizing testimony); FDA, Domestic MOUs, MOU No. 225-14-017, https://www.fda.gov/about-fda/fda-memoranda-understanding/domestic-mous (last visited Jan. 24, 2024) (explaining that this memorandum "was first signed in 2014, amended in 2019, and revised in 2023").

plaintiff's proposed but-for world:  FDA would *not* have required Merck to change its label in a way that would have made it easier for GSK to mirror, and FDA therefore *would not have* granted GSK an FDA license sooner than it did.  In light of this conclusive real-world evidence, no reasonable jury could find otherwise; summary judgment in favor of Merck is warranted.  *See Wellbutrin*, 868 F.3d at 166-167; *Meijer*, 533 F.3d at 862-865.

## CONCLUSION

For the foregoing reasons, Merck respectfully requests that this Court reverse the District Court's order denying Merck's motion for summary judgment and remand with instructions to enter summary judgment in favor of Merck.

Respectfully submitted,

January 24, 2024

Lisa C. Dykstra
R. Brendan Fee
Zachary M. Johns
MORGAN, LEWIS & BOCKIUS LLP
2222 Market Street
Philadelphia, PA 19103-2921

Dino S. Sangiamo
Sally W. Bryan
Kathleen Hardway
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202

/s/ Jessica L. Ellsworth
Neal Kumar Katyal
Jessica L. Ellsworth (D.C. Bar No. 484170)
Michael J. West
Kristina Alekseyeva*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Admitted only in New York; practice supervised by principals of the firm admitted in D.C.*

*Counsel for Defendant-Appellant Merck & Co., Inc.*

# CERTIFICATION OF BAR MEMBERSHIP

Pursuant to Local Rules 28.3(d) and 46.1(e), I certify that I, Jessica L.

Ellsworth, am admitted as an attorney and counselor of the United States Court of

Appeals for the Third Circuit.


January 24, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth (D.C. Bar No. 484170)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Appellant*
*Merck & Co., Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1. This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,898 words, excluding those parts exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in Times New Roman 14-point font using Microsoft Word 2010.

3. This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because Cardon Black Defense version 3.4.0.1047 was run on the file containing the electronic version of the brief and no viruses were detected.

January 24, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth (D.C. Bar No. 484170)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Appellant
Merck & Co., Inc.*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate

CM/ECF system on January 24, 2024. All counsel of record are registered

CM/ECF users, and service will be accomplished by the CM/ECF system.

January 24, 2024

/s/ Jessica L. Ellsworth
Jessica L. Ellsworth (D.C. Bar No. 484170)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
jessica.ellsworth@hoganlovells.com

*Counsel for Defendant-Appellant*
*Merck & Co., Inc.*