No. 23-3089

IN THE

# United States Court of Appeals for the Third Circuit

## IN RE: MERCK MUMPS VACCINE LITIGATION

Interlocutory Appeal from the United States
District Court for the Eastern District of
Pennsylvania
No. 2:12-cv-3555-CFK, Judge Chad F. Kenney

### PLAINTIFFS-APPELLEES' BRIEF

John A. Macoretta
Jeffrey L. Kodroff
Diana Zinser
**SPECTOR ROSEMAN &
KODROFF PC**
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA 19103
(212) 496-0300

Kellie Lerner
Jonathan Edelman
Laura Song
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas,
Suite 2601
New York, NY 10019
(212) 980-7400

*Counsel for Plaintiffs-Appellees*
*Chatom Primary Care, P.C., Andrew Klein,*
*and John I. Sutter, M.D. on Behalf of Themselves*
*and the Proposed Class*

March 8, 2024

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rules 26.1 and 28(a) of the Federal Rules of Appellate Procedure and Third Circuit Local Appellate Rule 26.1.1(b), Plaintiffs-Appellees Chatom Primary Care, P.C., Andrew Klein, and John I. Sutter, M.D. disclose that they have no parent corporations, that no publicly held company holds 10% or more of their stock, and that there is no publicly held corporation which is not a party to the proceeding before this Court with a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...........................................I

INTRODUCTION ....................................................................... 1

STATEMENT OF ISSUES ........................................................... 4

STATEMENT OF THE CASE ....................................................... 4

    A.    Background ................................................................ 4

        1.    Merck's Monopoly in the Mumps Vaccine Market ....... 4

        2.    GSK Prepares to Enter the U.S. Market .................... 5

    B.    Merck Devises a Plan to Delay GSK's Market Entry ........... 6

    C.    Merck Unlawfully Delays GSK by Making False and Misleading Claims on Its Mumps Vaccine Labels ............... 8

        1.    Merck knew it could not support the label's 24-month shelf life ..................................................... 11

        2.    Merck knew tens of millions of doses of mumps vaccine were subpotent. ............................................ 13

        3.    Merck conceals its potency failures from FDA. ......... 16

        4.    Merck knew it could not support the seroconversion claim on the label. ........................... 18

        5.    Merck manipulated its mumps vaccine tests to defend the false 24-month shelf-life and seroconversion claims .............................................. 20

    D.    GSK's Delay Was Caused by Merck's False Labels ............ 24

    E.    Procedural History ............................................................. 27

STANDARD OF REVIEW ...................................................... 28

SUMMARY OF ARGUMENT .................................................. 29

ARGUMENT........................................................................ 32

I.    Substantial Evidence Supports the District Court's Finding of a Genuine Issue of Material Fact on Causation. .................. 32

# TABLE OF CONTENTS
(continued)

<b>Page</b>

A.    The District Court Detailed "Numerous Pieces of Evidence" Establishing Merck's Delay of GSK's Entry. ...... 32

     1.    Merck's internal documents establish causation. ...... 33

     2.    GSK's documents and testimony establish causation. ................................................ 35

     3.    Plaintiffs' unrebutted expert reports further establish causation. ................................................ 36

B.    Whether Merck's Caused Antitrust Injury Is a Question for the Jury. ................................................ 39

C.    There Is Ample Causation Evidence that Merck Does Not Challenge. ................................................ 39

D.    Neither GSK's Nor FDA's Actions Break the Chain of Causation. ................................................ 42

     1.    GSK's Actions Were Foreseeable Consequences of Merck's Deceptive Labels. ................................ 42

         a.    GSK's corporate designee's deposition testimony is not admissible, much less dispositive ................................................ 43

         b.    GSK's delay was both the foreseeable and intended consequence of Merck's deceptive labels. ................................................ 45

     2.    Plaintiffs Are Not Required to Prove that FDA "Would Have" Granted GSK a License Sooner. ...... 49

     3.    The 2019 Letters to FDA are Irrelevant to Causation ................................................ 51

II.    *Noerr-Pennington* Does Not Immunize Merck's Anticompetitive Behavior. ................................ 53

   A.    Merck's False Labeling Is Not Protected Petitioning. ...... 54

# TABLE OF CONTENTS
(continued)

**Page**

B. Merck's Communications with FDA Are Not Protected by *Noerr-Pennington*. .......................................... 58

  1. Merck's response to FDA enforcement is not petitioning. .............................................. 58

  2. The "sham" exception applies to Merck's deceptive communications with FDA. ...................... 59

CONCLUSION ............................................................. 66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
   486 U.S. 492 (1988) ........................................................................... 55

*Alpek Polyester, S.A. de C.V. v. Polymetrix AG,*
   No. 2021-1706, 2021 WL 5974163 (Fed. Cir. Dec. 16, 2021) ............ 43

*Altria Grp., Inc. v. Good,*
   555 U.S. 70 (2008) ...................................................................... 49, 51

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) .................................................................... 39, 45

*Andrx Pharms., Inc. v. Biovail Corp. Int'l,*
   256 F.3d 799 (D.C. Cir. 2001) ........................................................... 41

*Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem.
   Hosp.,*
   185 F.3d 154 (3d Cir. 1999) ................................................... 54, 63, 64

*In re Asbestos Prod. Liab. Litig. (No. VI),*
   822 F.3d 125 (3d Cir. 2016) .............................................................. 39

*Barton's Disposal Serv., Inc. v. Tiger Corp.,*
   886 F.2d 1430 (5th Cir. 1989) ..................................................... 54, 56

*Breidor v. Sears, Roebuck & Co.,*
   722 F.2d 1134 (3d Cir. 1983) ............................................................ 38

*Bristol-Myers Squibb Co. v. Ben Venue Lab'ys,*
   90 F. Supp. 2d 540 (D.N.J. 2000)...................................................... 46

*Cal. Motor Transport Co. v. Trucking Unlimited,*
   404 U.S. 508 (1972) .......................................................................... 64

*Callahan v. A.E.V., Inc.,*
   182 F.3d 237 (3d Cir. 1999) .............................................................. 39

*Carvalho-Grevious v. Del. State Univ.*,
   851 F.3d 249 (3d Cir. 2017) ............................................ 32

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
   168 F.3d 119 (3d Cir. 1999) ................................ 59, 61, 62, 63, 65

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser
   Co.*, No. CV 00-1693-PA, 2003 WL 24901381 (D. Or. July 5,
   2003) ................................................................................ 61

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ........................................................ 58

*E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127, 138 (1961) ................................................. 58

*Est. of Knoster v. Ford Motor Co.*,
   No. 01-cv-3168(MLC), 2008 WL 5416399 (D.N.J. Dec. 22,
   2008) ................................................................................ 35

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   415 F. Supp. 176 (E.D. Pa. 1976) .................................... 46

*In re Flonase Antitrust Litig.*,
   795 F. Supp. 2d 300 (E.D. Pa. 2011) ............................... 60

*In re Flonase Antitrust Litig.*,
   798 F. Supp. 2d 619 (E.D. Pa. 2011) .......................... 45, 46

*Harrison Aire, Inc. v. Aerostar International, Inc.*,
   316 F. Supp. 2d 186 (E.D. Pa. 2004), *aff'd*, 423 F.3d 374
   (3d Cir. 2005) .................................................................. 52

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ........................................................ 49

*In re HIV Antitrust Litig.*,
   No. 19-cv-02573, 2023 WL 3089820 (N.D. Cal. Mar. 7,
   2023) ................................................................................ 51

*Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*,
  760 F.2d 607 (5th Cir. 1985)............................................................. 60

*Kottle v. Nw. Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998).................................................... 63, 64

*In re Lipitor Antitrust Litig.*,
  868 F.3d 231 (3d Cir. 2017) ........................................ 49, 51, 55, 64

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
  700 F.2d 785 (2d Cir. 1983) ........................................................54, 58

*Meijer, Inc. v. Biovail Corp.*,
  533 F.3d 857 (D.C. Cir. 2008) ................................................... 49, 50

*Mercatus Group, LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011)...............................................55, 64, 65

*Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of
  Kansas City*,
  452 U.S. 378 (1981) ........................................................................ 52

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  42 F. Supp. 3d 231 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st
  Cir. 2016)....................................................................................... 35

*Out Front Prods., Inc. v. Magid*,
  748 F.2d 166 (3d Cir. 1984) ............................................................ 40

*Pers. Dep't, Inc. v. Pro. Staff Leasing Corp.*,
  297 F. App'x 773 (10th Cir. 2008)................................................... 60

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
  998 F.2d 1224 (3d Cir. 1993) .......................................................... 29

*Pro. Real Estate Inv'rs v. Columbia Pictures*,
  508 U.S. 49 (1993) .....................................................................59, 60

*Roxane Lab'ys, Inc. v. Smithkline Beecham Corp.*,
  No. CIV.A 09-cv-1638, 2010 WL 331704 (E.D. Pa. Jan. 26,
  2010).............................................................................................. 40

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
No. 13-md-2445, 2015 WL 12910728 (E.D. Pa. Apr. 14, 2015) ................................................................................ 46

*Thabault v. Chait*,
541 F.3d 512 (3d Cir. 2008) ............................................. 39

*Thomas v. Newton Int'l Enters.*,
42 F.3d 1266 (9th Cir. 1994) ........................................... 38

*Ticor Title Ins. Co. v. F.T.C.*,
998 F.2d 1129 (3d Cir. 1993) ..........................54, 55, 56, 57

*Tse v. Ventana Med. Sys., Inc.*,
297 F.3d 210 (3d Cir. 2002) ............................................. 59

*United Mine Workers of Am. v. Pennington*,
381 U.S. 657 (1965) ......................................................... 57

*United States v. Care Alternatives*,
952 F.3d 89 (3d Cir. 2020) ............................................... 38

*In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017) ........................................49, 62

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) .............................. 59

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U.S. 100 (1969) ......................................................... 39

## Statutes and Regulations

Fed. R. of Evid. 602 .....................................................43, 44

Fed. R. Evid. 801(c) ........................................................ 43

21 C.F.R. § 201.56(a)(2) .................................................. 50

## Other Authorities

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 349a (4th & 5th eds. 2023)............................................................. 40, 42

FDA, *Regulatory Procedures Manual* § 4-1-1 (2022), https://www.fda.gov/media/71878/download..................................... 14

FDA, *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry* (2016), https://www.fda.gov/media/78504/download...................................... 5

## INTRODUCTION

Appellant Merck & Co., Inc. sought this appeal to avoid liability for its unlawful scheme to maintain its monopoly over mumps-containing vaccines and overcharge vaccine purchasers. From 1967 until 2022, Merck was the sole licensed provider of measles-mumps-rubella ("MMR") vaccines in the United States, enjoying monopoly profits for over 50 years. In 1997, GlaxoSmithKline ("GSK") sought to end Merck's monopoly by launching its own MMR vaccine, Priorix, which had been approved and sold in over 100 countries. Confronted with a threat to its "flagship" pediatric vaccine, Merck implemented a scheme to unlawfully protect its monopoly, which centered on the false and misleading claims on its mumps-vaccine labels that GSK needed to match to enter the U.S. market. Merck knew neither its vaccine, nor GSK's, could meet those claims. Merck's strategy succeeded: it delayed GSK's entry into the U.S. market by over a decade. Plaintiffs, family physicians who purchased Merck's mumps vaccines at monopoly prices for decades, brought this action under Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15, to recover their overpayments.

1

Relying exclusively on an all-consuming view of First Amendment petitioning immunity under the *Noerr-Pennington* doctrine and selected passages of a non-party corporate designee's testimony, Merck seeks to overturn the district court's 45-page, fact-laden opinion denying Merck's motion for summary judgment. First, Merck ignores that the district court relied on 274 exhibits of Plaintiffs' evidence, nearly all of which Merck has never alleged fall under *Noerr-Pennington* protection. These exhibits include Merck's internal documents, Merck's public statements, and unrebutted expert testimony. Instead, Merck attacks strawmen, structuring its appeal around the notion that "Plaintiffs claim to have been injured by the outcome of Merck's regulatory petitioning to the FDA," Br. 1, while sidestepping the district court's determination that a reasonable jury could find that Merck's marketplace conduct blocked GSK's entry and caused Plaintiffs' injuries.

Second, Merck impermissibly asks the Court to weigh Plaintiffs' evidence of causal antitrust injury. Of course, Merck overvalues cherry-picked testimony from GSK's corporate designee about the purported reasons for its delay and undervalues Plaintiffs' extensive evidence—including other testimony from the same designee, Plaintiffs'

unrebutted expert testimony, and Merck's own admissions—that Merck's labeling caused GSK's delay. But resolving conflicting evidence and competing inferences is the quintessential function of the jury.

Separately, the district court correctly found that Plaintiffs based their claims on Merck's public labeling and expert testimony—none of which is claimed to be protected petitioning activity. Appx. 34–35. Merck identifies no evidence or legal authority to undermine the district court's conclusion, which should dispose of Merck's appeal. Merck has never identified which specific documents it claims are protected under *Noerr-Pennington*, a fatal flaw in its argument at the district court and one it cannot correct now.

Finally, even if Plaintiffs' case hinged on Merck's deceitful responses to the few FDA inquiries Merck identifies, which it does not, the district court correctly concluded these communications were nevertheless undeserving of *Noerr-Pennington* immunity. Factual disputes remain over whether, at their "very core," these responses were a mere sham intended to exclude competition.

3

## STATEMENT OF ISSUES

1.     Did the district court commit reversible error in holding that there is a dispute of material fact over whether Merck's conduct and public statements caused Plaintiffs' antitrust injury by delaying competitor GlaxoSmithKline's ("GSK's") entry into the U.S. mumps-containing vaccine market, where Plaintiffs presented voluminous evidence of delay from Merck's own internal documents, GSK's internal documents and testimony, and unrebutted expert opinions?

2.     Did the district court commit reversible error in holding that the *Noerr-Pennington* doctrine does not entitle Merck to summary judgment, where Plaintiffs base their antitrust claims on Merck's false and misleading public statements in its labels as well as information never disclosed to FDA?

## STATEMENT OF THE CASE

### A.     Background

#### 1.     Merck's monopoly in the mumps vaccine market.

For over 50 years, Merck held a monopoly as the sole licensed mumps vaccine provider in the United States.[1] Unsurprisingly, Merck

---

[1] Appx9767.

increased prices every year.[2] By Merck's own calculation, its 93% profit

margin made its mumps vaccine, MMRII, "by far [its] most profitable

brand."[3]

### 2.    GSK prepares to enter the U.S. Market.

In 1997, GSK began selling Priorix in Europe and sought approval

to do the same in the United States.[4] GSK saw the U.S. market as a

lucrative opportunity because regulators and purchasers demanded

competition.[5] Looking at GSK's clinical data, Merck viewed GSK's entry

as "imminent."[6]

But Merck controlled the key to GSK's entry. To gain U.S.

approval, GSK had to demonstrate that Priorix was "non-inferior" to

Merck's vaccine.[7] This meant GSK had to "mirror[]" the potency, shelf-

life, and seroconversion claims on Merck's mumps-vaccine labels.[8]

Merck's false, inflated labeling claims delayed GSK's entry by *over a*

---

[2] Appx9767; Appx3422.

[3] Appx9767; Appx4840.

[4] Appx9809; Appx6723.

[5] Appx9809; Appx6820; Appx6825; Appx4680.

[6] Appx9775; Appx4840.

[7] FDA, *Non-Inferiority Clinical Trials to Establish Effectiveness: Guidance for Industry* (2016), https://www.fda.gov/media/78504/download.

[8] Appx18; Appx1471 (Tr. 97:3–8).

*decade. See infra* p. 26.

## B.    Merck Devises a Plan to Delay GSK's Market Entry.

In the mid-1990s, Merck sounded an internal alarm: "MMRII is under *imminent threat* of a major competitive launch."[9] It recognized that GSK's "Priorix is the first serious competition to Merck & Co.'s MMR*II vaccine."[10] Merck acknowledged that GSK was "well-positioned" to bring Priorix to market.[11] An internal email alert about impending Priorix clinical studies warned: "[GSK] IN OUR BACKYARD."[12]

GSK's European studies showed that the vaccines produced similar seroconversion rates.[13] Merck's own studies showed the same.[14] Merck even worried that Priorix outperformed Merck's vaccine because it hurt less when administered to children[15]—"a major competitive difference" that would "impact[] market share."[16] Priorix was also more

---

[9] Appx9775; Appx4844; Appx4840; Appx5238 (emphasis added).
[10] Appx9775; Appx4287.
[11] Appx9776; Appx7743.
[12] Appx9776; Appx5291.
[13] Appx9774; Appx4287–88.
[14] Appx9774; Appx4357; Appx6460; Appx4475.
[15] Appx9788–89; Appx4288.
[16] Appx7726; Appx9122.

stable, with a proven shelf life of 24 months.[17] Merck's vaccine had

recently been "short-dated" to 18 months in at least one European

country, and FDA had threatened to require Merck to reduce the 24-

month shelf life in the United States.[18]

Merck's own documents and witnesses confirm that Priorix's entry

would subject Merck's vaccine to "[c]ompetitive pressure including price

erosion."[19] Since "price wins out when all other parameters are

equivalent,"[20] Merck acknowledged internally that "the loss of revenue

seemed inevitable"[21] and forecast it would cut prices once GSK

entered.[22] In short, Merck stood to lose both volume and margins on

what was the most profitable vaccine in its portfolio.[23]

Merck responded with a "Market Preservation Strategy" centered

around a new committee called the "MMRII Competitive Defense Task

---

[17] Appx9789; Appx6720.

[18] Appx9789; Appx8223.

[19] Appx9777; Appx7766.

[20] Appx9777; Appx4457; Appx3425.

[21] Appx9777; Appx7249.

[22] Appx9777; Appx7803; Appx7828–30 (offering lower contract bundling
discounts "Pre-Competition Launch" and higher discounts "Post-
Competition Launch").

[23] Merck does not challenge any of its employees' statements in this
paragraph.

Force."[24] Its explicitly anticompetitive purpose was to "delay and disrupt the launch of Priorix into the market"[25] by launching a "Pre-emptive Regulatory Strike,"[26] including by "ma[king] the review criteria used for the Priorix application more stringent."[27] Merck caused this delay by maintaining false and misleading mumps vaccine labels that Merck knew it could not meet itself.

Later, Merck acknowledged it had caused GSK's delay and credited its Competitive Defense Task Force with successfully "'raising the bar' for the competition at every available opportunity."[28]

## C.   Merck Unlawfully Delays GSK by Making False and Misleading Claims on Its Mumps Vaccine Labels.

By 2001, Merck knew its mumps vaccine label was false and misleading. Merck could not ensure that its mumps vaccine met the minimum potency for the full 24-month shelf life, and it could no longer support its claim that the vaccine achieved greater than 90% seroconversion. This meant Merck lacked clinical data to support both

---

[24] Appx9776; Appx5287; Appx4735.
[25] Appx9776; Appx4840; Appx4842.
[26] Appx9776; Appx5291.
[27] Appx9776; Appx5294.
[28] Appx9778; Appx4839.

lowering the potency claim and the seroconversion claim on the label. These problems were interrelated. If the label continued to claim a 24-month shelf life, the product would not satisfy the potency claim at expiry. If Merck's mumps vaccine was not potent enough, it would not create enough antibodies to satisfy the seroconversion claim. Merck understood that these problems rendered its vaccine "misbrand[ed]"[29] and "out of compliance,"[30] meaning that it had an obligation to correct its labeling statements and risked potential recall or other FDA action.

While Merck considered shortening the 24-month shelf life to maintain its potency claim through expiry and lowering the 96% seroconversion claim to reflect the results of its testing[31]—the clinically correct, legally required course of action—Merck instead chose to continue selling a misbranded vaccine. Merck did so because either change would "open the door wider for competition."[32] According to Merck personnel responsible for its mumps vaccine:

- "Relaxing the criteria of success would lower the bar for

---

[29] Appx9788; Appx7714.
[30] Appx9788; Appx5666; Appx5444 ("[T]here are released lots which, at 24 months, are projected to be below 4.0 (100 lots) or 3.7 (6 lots). This will be a *compliance issue with the agency*." (emphasis added)).
[31] Appx9789–90; Appx5030–32.
[32] Appx9777; Appx5375.

the competition and facilitate [GSK's] entry into the U.S. market."[33]

-   "[L]owering the seroconversion rate in the label would help GSK."[34]

-   "An adjustment to the shelf life of M-M-R®II from 24 to 18 or 12 months will have a commercial impact on the business... [including] international loss of share due to a competitive disadvantage (competitors at 24 months)."[35]

-   "If this is not resolved and doesn't change → label may have to be changed from 96% to 75% (concern if Smith Kline has better sensitivity and higher seroconversion rates – competition??"[36]

-   "Estimated* shelf-life with 4.3 log TCID50 is **<12 months, a potentially non-marketable shelf life**."[37]

Merck's refusal did, in fact, impede competition. Plaintiffs' expert and former FDA Commissioner Dr. David Kessler opined: "the claims set forth in Merck's MMRII and ProQuad labels could and do impact the standards for relative effectiveness that other manufacturers would have to meet to obtain FDA approval to market similar products in the United States."[38]

---

[33] Appx5031.
[34] Appx5037.
[35] Appx4962.
[36] Appx7716.
[37] Appx5320.
[38] Appx9811; Appx2898.

If Merck *had* changed its label claims, it would have (1) eased GSK's market entry and (2) alerted GSK to the attractive prospect of market entry.[39] Dr. Kessler rejected any scientific basis for maintaining these claims and testified that the only plausible reason for Merck's refusal to make these necessary changes was to impede competition.[40]

### 1. Merck knew it could not support the label's 24-month shelf life.

Merck knew that its vaccines lost potency before the end of their 24-month shelf life. In September 1999, Merck instituted a vaccine "overfill," effectively doubling the amount of virus in each dose. Nevertheless, Merck knew, but never disclosed, that "even the use of a higher release potency overfill may not be sufficient" to reach the "expiry potency through shelf-life" on its label.[41]

Merck knew that "short dating may be required"[42] and its analysts had a simple, clinically sound, solution: shorten its vaccine's shelf life to 12 months. They concluded that "[o]ur expiry dating needs to be 12

---

[39] Appx9820; Appx1602–03; Appx1608; Appx 1610; Appx1611; Appx 1612; Appx1613; Appx1614–15; Appx1616.

[40] Appx9786–87; Appx1264–65 (Tr. 260:10–262:7); Appx1269 (Tr. 363:4–17).

[41] Appx5630; Appx9785.

[42] Appx9785; Appx5631.

months in order to provide 95% confidence that a lot released at 5.0 [i.e., the overfill potency] will be above 4.3 [the stated potency] at expiry."[43] Dr. Kessler will testify that mumps vaccines were adulterated by Merck's failure to update its shelf-life and potency claims.[44]

But Merck kept the shelf life at 24 months. Merck's own documents explain that shortening to 12 months would create "a potentially non-marketable shelf life,"[45] rendering the product non-viable,[46] which was "of significant concern to marketing."[47] The potential impact was global: "[a]n adjustment to the shelf life of MMRII from 24 to 18 or 12 months will have a commercial impact on the business in several ways," including "[i]nternational loss of share due to a competitive disadvantage (competitors at 24 months)."[48]

---

[43] Appx5620; Appx9785.

[44] Appx2761; Appx2924–29 ("In my opinion, from May 1998-December 2007, MMRII was adulterated because Merck was unable to assure the potency specification for mumps of not less than 4.3 $\log_{10}$ . . . for the shelf life of the vaccine.").

[45] Appx5320; Appx5025; Appx5357.

[46] Appx9786; Appx8027 ("[W]e absolutely have to have an end expiry of 4.0 to be viable [because failure to comply with 4.3 log[] mumps end-expiry potency specification] would mean 'no product' since shelf life estimates reduce to less than 12 month.").

[47] Appx9786; Appx8030.

[48] Appx4962 (alteration in original); Appx9786.

GSK's 24-month shelf life would have been a clear advantage over Merck's vaccine. Dr. Thomas Copmann, a pharmaceutical-industry expert, will testify that "shortening . . . the shelf life of [MMRII] to 12 or 18 months would have created a significant incentive for a competitor to enter the market with an MMR vaccine that had a 24-month shelf life."[49] As Dr. Kessler testified, Merck's only reason to keep a false shelf life on the label was delaying GSK's entry.[50]

### 2. Merck knew tens of millions of doses of mumps vaccine were subpotent.

On October 11, 2000, FDA inspectors issued a Form 483, a citation to Merck for failing to report over a dozen mumps vaccine lots that fell below the potency claim long before the 24-month shelf life expired.[51] Merck responded that those lots were all "within the expected range based on historical trends."[52] Unsatisfied, FDA escalated its concerns by issuing a Warning Letter on February 9, 2001,[53] reminding Merck of its

---

[49] Appx1123.

[50] *See supra* note **Error! Bookmark not defined.** and accompanying t ext.

[51] Appx9780; Appx5417–18.

[52] Appx9780; Appx7900.

[53] FDA issues Warning Letters "only for violations of regulatory significance . . . [which] may lead to enforcement action if not promptly

existing obligation that "[p]roducts must meet their [label] specifications, not the historical trend."[54] FDA required Merck to "describe[e] the range of potencies" of mumps vaccine lots that may still be on the market and to "summarize the available data regarding product efficacy" at lower potencies.[55]

In preparing responses to the Warning Letter, Merck identified a compliance issue, with 225 lots (roughly *23 million doses*) of mumps vaccine at risk of falling below the potency claim before the end of the shelf life.[56] Dr. Dorothy Margolskee[57] shared an analysis with Merck's most senior executives—including the President of MRL and a member of the Merck Board of Directors—raising the likelihood of (1) a "potential product recall," (2) the need for a study to trace which infants

---

and adequately corrected." Appx2557 ("The Warning Letter [is] the next regulatory mechanism after the Form 483 before FDA could initiate an enforcement action to assure Merck's compliance with the law."); *see also* FDA, *Regulatory Procedures Manual* § 4-1-1 (2022), https://www.fda.gov/media/71878/download. Responses to Form 483 and Warning Letters are thus required by a vaccine manufacturer.

[54] Appx9780–81; Appx5408.

[55] Appx5408.

[56] Appx9781; Appx5464 (Released Lots Tab: identifying (i) 225 lots (comprising roughly 23 million doses) where "Est titer End-expiry" is less than or equal to 4.2 log).

[57] Dr. Margolskee was a senior vice president at Merck Research Laboratories ("MRL"), the Merck division that ran its clinical studies.

received subpotent doses, and (3) the "potential revaccination of large infant cohorts!"[58] At deposition, Dr. Margolskee did not deny or rebut these facts—she merely claimed she could not remember them.[59] No Merck witness has suggested Dr. Margolskee's conclusions and concerns were incorrect.

Merck knew that disclosing these subpotent doses would "potentially culminat[e] in a recall or 'branding' of the M-M-R family of vaccines."[60] According to Dr. Kessler, "bells would have been set off at the agency,"[61] and FDA could have taken a range of enforcement actions, including seizures, a tracing study (to identify which children received subpotent vaccine), or a monetary penalty.[62] According to Dr. Copmann, any of these enforcement actions would have affected GSK's timing and approval of Priorix.[63]

---

[58] Appx9782; Appx5445–46. Both FDA and Merck considered a recall a distinct possibility. *Id.*

[59] Appx1081; Appx5559–60.

[60] Appx5687; Appx9788.

[61] Appx1261 (Tr. 225:9–17); Appx9783. In preparing for his deposition, Dr. Kessler calculated the number of subpotent doses was actually more than the 23 million Merck identified in 2001. Appx1254–55 (Tr. 30:18–34:18).

[62] Appx9783; Appx1256 (Tr. 141:22–142:1).

[63] Appx9783; Appx1610.

### 3.    Merck conceals its potency failures from FDA.

Faced with an existential threat to its flagship vaccine,[64] Merck simply hid this information from FDA. Although a draft response to the FDA Warning Letter described the 225 subpotent lots, Merck deleted the reference from the final version it submitted.[65] Merck also omitted its internal calculation that, *even with the overfill*, it could only ensure compliance with the potency claim for as few as 12 months.[66] Merck falsely represented in its final draft of the response that all "products have end-expiry specifications consistent with their label" post-overfill[67] and "all corrective actions necessary to meet the label claim compliance

---

[64] Appx9775; Appx4747.

[65] Appx9782; Appx5537–39; Appx5527–35.

[66] Appx9785; Appx5077 ("**Compliance:** Even with higher mumps target, current stability data suggest 4.3 [log] at expiry cannot be supported." (emphasis in original)); Appx5071 ("Stability data do not support current end of shelf life label claim (4.3 log[])[.]"); Appx7702 ("Product still not compliant with labeled mumps potency. . . . [Merck] must file a Biologic Product Deviation Report to CBER detailing results of investigation and medical impact (estimate ~7% of lots)[.]"); Appx5587 ("We've been lucky with mumps so far, but it's only a matter of time, since we can statistically predict that a certain number of lots will fail on stability."); Appx5630 ("[E]ven the use of a higher release potency overfill may not be sufficient to maintain the CBER requested expiry potency through shelf-life."); Appx5590 ("The assessment of shelf life needed to maintain 4.3 [log] was reported . . . to be limited 12 month only.").

[67] Appx9783; Appx5532.

have been taken."[68]

In March and April 2001, Merck sent FDA two statutorily required Biologics Product Deviation Reports ("BPDRs"), reporting similar problems meeting the claims on its labels but once again reporting that the overfill had solved the problem.[69] FDA took no further action, which Merck inferred was because FDA believed Merck:

> [W]e stated that we implemented a new mumps release specification (5.0/dose) to ensure lots at expiry would meet 4.3/dose at expiry. Therefore, from CBER's point of view, they may be expecting all recent lots . . . to meet 4.3/dose through expiry. That may explain the fact that there has been no negative feedback in response to the BPDRs.[70]

Yet Merck also admitted that its "corrective actions (adding more mumps and increasing the release specification) did not ensure we meet 4.3/dose at expiry as previously indicated"[71]—instead, "approx. 7% of the lots are expected to be <4.3 at expiry."[72]

Merck's lies and omissions about potency reveal the machinations it took to keep GSK out of the market to protect its unlawful monopoly.

---

[68] Appx9783; Appx4950.

[69] Appx9784; Appx9732; Appx9739; Appx5575.

[70] Appx9784; Appx5575.

[71] Appx9784; Appx5575 (alterations in original).

[72] *Id.*

Merck dismisses its lies as irrelevant but neither denies nor explains them.[73]

### 4. Merck knew it could not support the seroconversion claim on the label.

As Merck confronted its potency and shelf-life problems, it also learned it could no longer support the seroconversion claim on its labels.

To support its seroconversion claim, Merck needed to demonstrate a link between its plaque reductions neutralization assay ("PRN")[74] and efficacy by achieving the same rate of neutralizing antibodies that its 40-year-old PRN referenced on its labels had achieved: 96 percent.[75] At the very least, Merck needed to satisfy "an absolute criterion that the lower limit of conversion rate is above 90%."[76] This 90% lower limit was vital to delaying GSK's entry. Merck's preliminary testing showed seroconversion rates well below 90%, and in some instances, as low as 56%.[77] Internally, Merck admitted that these results "may be telling us

---

[73] Appx6.

[74] As Merck describes, a PRN measures the ability of antibodies in serum to neutralize virus. Br. 9.

[75] Appx9791; Appx5108; Appx3812; Appx5139.

[76] Appx5096; Appx9791.

[77] Appx9792; Appx5144.

what the neutralization against [a] wild[-type virus] truly is."[78]

A label change would have corrected this lie, but a key Merck committee "recommended that we do not broaden the [seroconversion rate] bound to 85% . . . since *broadening the range would open the door wider for competition*."[79] Merck's Competitive Defense Task Force warned: "If this is not resolved and doesn't change → label may have to be changed from 96% to 75% (concern if [GSK] has better sensitivity and higher seroconversion rates – competition??[)]."[80]

The competitive consequences were profound. Because GSK's product had to mirror Merck's label, Dr. Florian Schodel, the Executive Director of Biologics/Vaccine Clinical Research for MRL, admitted that "*lowering the seroconversion rate in the label would help GSK*."[81] Merck kept its 96% claim on the label because "relax[ing] the criteria of success would lower the bar for the competition and facilitate [GSK's] entry into the U.S. market."[82]

---

[78] Appx9792; Appx5372. A "wild-type" virus is one circulating in the real world, as opposed to a strain that is modified for use in a vaccine.

[79] Appx9777; Appx5375 (emphasis added).

[80] Appx7716; Appx9792–93.

[81] Appx9776; Appx5037.

[82] Appx9776–77; Appx5327.

### 5. Merck manipulated its mumps vaccine tests to defend the false 24-month shelf-life and seroconversion claims.

Merck knew that keeping its 24-month shelf-life claim was key to preventing GSK's market entry. Because Merck knew that its mumps vaccines did not meet their claimed potency at 24 months, Merck was "disperate" [sic] to persuade FDA to allow lowering its potency claim.[83] Merck determined that "[r]eduction in the labeled potency for mumps is necessary to ensure compliance with shelf-life claim."[84] FDA would only allow Merck to lower its potency claim if Merck could show at least 90% seroconversion at the new, lower potency.[85]

Merck's testing to establish seroconversion at this lower potency became known as Protocol 007. It used two tests: the Anti-IgG Enhanced Neutralization Test ("AIGENT"), and the Enzyme-Linked Immunosorbent Assay ("ELISA").[86] Though Merck claimed these tests reflected actual protection against mumps, neither did.

---

[83] Appx5676; Appx9788.
[84] Appx9147; Appx9790.
[85] Appx9791; *see supra* note 76.
[86] Appx9793.

*The Protocol 007 AIGENT*

Merck devised the result-oriented AIGENT to artificially support its 95% seroconversion rate claim. Merck's Dr. David Krah, the scientist who created and manipulated the test, admitted at deposition, "[t]he goal . . . was to develop an assay that was capable of detecting a 95% seroconversion rate without considering the impact on accuracy."[87] When dubious test designs were insufficient, Merck altered or destroyed unfavorable data to reach the desired seroconversion rate.[88] These falsified results led FDA to investigate and cite Merck for making "revisions to raw data" without justification in August 2001.[89]

Merck scientists admitted that the AIGENT results did not "reflect protection."[90] For example, Dr. Schodel called the AIGENT a "very unreliable assay" and stated he "could not overemphasize [its] weakness."[91] Similarly, Plaintiffs' expert on quality assurance in laboratory testing, Peter Calcott, Ph.D, opined, "I have found no

---

[87] Appx9799; Appx5133–5134 (Tr. 723:1–4; 756:21–726:17).
[88] Appx9795–98.
[89] Appx9797–98; Appx7721.
[90] Appx6467 (Tr. 151:10–22) ("So, no, [the AIGENT serostatus cutoff is] not indicative of protection against the virus . . . ."); Appx9802.
[91] Appx9801; Appx6481 (Tr. 321:16–18).

evidence that the data generated from Protocol 007 is reliable data."[92] Merck has not presented any facts or expert testimony to rebut this opinion.

### The Protocol 007 ELISA

Merck also used an ELISA, which could show protection against mumps by correlating its ELISA to a PRN.[93]

Merck selected an arbitrary antibody count cutoff for its ELISA testing, which it claimed would provide sufficient protection from mumps. Multiple Merck witnesses testified, however, that this level does not adequately protect against mumps.[94] The Merck statistician who conducted the correlation analysis testified that "the ELISA did not in any way relate to seroprotection."[95] Dr. Kessler will testify that neither Protocol 007 test, AIGENT or ELISA, had any relationship to protection from mumps.[96]

The cutoff Merck chose also failed to show correlation between the AIGENT and the ELISA, as Merck internally admitted: "*data indicate*

---

[92] Appx6565; Appx9798.

[93] Appx9793–94.

[94] Appx9804.

[95] *Id.*; Appx6473 (Tr. 233:7–12).

[96] Appx2929–30; Appx2934.

*no correlation between . . . PRN . . . vs. ELISA.*"[97] Plaintiffs' expert Dr. Calcott agreed that Merck "failed to show any kind of meaningful correlation between the AIGENT assay and the WT ELISA assay . . . . As such, the data and conclusions are meaningless."[98] Despite this lack of correlation, Merck repeatedly characterized the ELISA–AIGENT correlation as "excellent" and "strong."[99]

Merck made additional public statements about its testing results to delay GSK's market entry. Merck described Protocol 007 on ClinicalTrials.gov—directed to the public, including GSK—as an "Efficacy Study," even though Merck's witnesses and experts admitted that Protocol 007 "did not include a proper analysis of vaccine efficacy."[100] Also, in September 1999, Merck scientists wrote a letter to the editor of the *Pediatric Infectious Disease Journal* claiming that Merck's ELISA was related to protection because it had correlated the

---

[97] Appx9804; Appx6639 (emphasis added).
[98] Appx9804; Appx6494.
[99] Appx9795; Appx5778.
[100] Appx5086 (Tr. 28:10–21); Appx5088–89 (Tr. 37:25–38:4 (explaining that "vaccine efficacy" means "protection or effectiveness")); Appx5135 (Tr. 754:2–7 ("I do not agree that the data were designed to indicate whether they were protected or not.")); Appx9803.

ELISA to a PRN but GSK had not.[101] That letter to the editor directly contradicted an internal document from that same month, in which Merck noted "the PRN . . . performance at 70–75% neutralization against WT, and the lack of a correlate . . . with ELISA."[102]

### D.    GSK's Delay Was Caused by Merck's False Labels.

In 1998,



[106] That is exactly what Merck did in its Protocol 007, as detailed above.

---

[101] Appx9818–19; Appx3848–50.

[102] Appx9819; Appx5372.

[103] Appx9812; Appx7111. After GSK submitted its IND, FDA put GSK's application on "clinical hold," citing concerns that the ELISA results it had submitted did not correlate to protection. Appx9812. In 1998, FDA kept the hold in place until GSK could correlate its ELISA to a PRN test. *Id.*

[104] Appx4668.

[105] Appx9812; Appx7111.

[106] Appx9812; Appx7111.

GSK then spent the next decade meeting with FDA and developing a scientifically valid test that would demonstrate greater than 90% seroconversion to "mirror" Merck's label.

Finally, in 2012, GSK went straight to the source of Merck's label claims: it obtained approval to use Merck's ELISA test, which had become commercially available.[107] ████████████████████

████████████████████████████████████████

███████████████████████ ██ ████████████████████[109]

GSK then finally launched Phase III studies, the last step before submitting its BLA to sell Priorix in the United States.[110]

GSK's results with Merck's ELISA confirm that Merck's deceptive label claims were the cause of GSK's delay all along. In 2015, GSK acknowledged the real cause, telling its Chairman of Vaccines that "discussions with CBER about the [endpoints] and assays to be used in phase III . . . proved to be protracted, since we could not meet the serological acceptability criteria . . . . *[U]ltimately, having access to the*

---

[107] Appx9815.
[108] *Id.*; Appx2220.
[109] Appx9815; Appx2239.
[110] Appx9815.

*Merck Mumps ELISA . . . facilitated these discussions.*"[111]

When GSK learned about Plaintiffs' allegations, its executives asked whether it might have "implications on our 'non inferiority' benchmark of the US registration"[112] and might result in "[e]arlier introduction of Priorix . . . in the US??"[113]

In addition, Plaintiffs' expert Dr. Copmann opined that had Merck told the truth that it lacked clinically relevant data showing greater than 90 percent seroconversion, GSK would not have needed to "obtain higher PRN seroconversion results" or "validate its ELISA assay with correlation data to demonstrate non-inferiority."[114] Accordingly, GSK would have started its Phase III studies years earlier and come to market over a decade sooner.[115] Dr. Copmann's opinions here were not challenged by Merck.

While Merck now claims that there is no "causal connection" between its misconduct and GSK's delay *see, e.g.*, Br. 48, its contemporaneous documents tell a different story. For example,

---

[111] Appx9816; Appx3381 (emphasis added).
[112] Appx9815–16; Appx3461.
[113] Appx9816; Appx3465.
[114] Appx9820–21; Appx1608.
[115] Appx1609; Appx9821; Appx1547.

- Merck deemed it "noteworthy that Priorix was never granted US approval. *The M-M-R®II Competitive Defense Task Force was largely responsible* for generating and publishing the data that highlighted the differences between the two vaccines."[116]

- Merck also wrote that the Competitive Defense Task Force "has succeeded in 'raising the bar' for competition at every available opportunity."[117]

- A former Merck employee who chaired the Competitive Defense Task Force boasted on her resume, "*[o]bjective achieved – Priorix™ never launched in US.*"[118]

- Merck reported hearing from GSK that "because of M-M-R®II, the bar had been set very high."[119]

These documents, along with fact and expert testimony, provide ample evidence for a jury to find that Merck's conduct caused GSK's delayed entry.

### E.    Procedural History

In 2012, Plaintiffs brought a class action, alleging that Merck's false and misleading vaccine labels unlawfully delayed GSK's market entry and caused Plaintiffs to pay higher monopoly prices.[120] The district court denied Merck's motion for summary judgment on

---

[116] Appx9816; Appx7251–52 (emphasis added).
[117] Appx9817; Appx7281.
[118] Appx9817; Appx7472 (emphasis in original).
[119] Appx9817; Appx8209.
[120] Appx5.

Plaintiffs' antitrust claim, recognizing that *Noerr-Pennington* does not apply to "Merck's false and misleading label claims,"[121] or to information withheld from FDA.

The district court also held that "genuine issues of material fact" prevented it from resolving whether certain of Merck's communications with FDA fell within *Noerr-Pennington*'s sham exception.[122] Merck refused to identify the exact "petitioning at issue" and "just cited to the Plaintiffs' general allegations in the Amended Complaint."[123]

Further, the district court considered Plaintiffs' "[n]umerous pieces of evidence" and found that "genuine issues of material fact remain as to the question of whether Merck caused Plaintiffs' [antitrust] injury," thus creating "a triable issue of fact" as to causation.[124]

## STANDARD OF REVIEW

This Court "review[s] the district court's summary judgment

---

[121] Appx30.

[122] Appx31–32.

[123] Appx31.

[124] Appx35–36. Indeed, Plaintiffs submitted a combined 341 paragraphs of disputed facts and 274 exhibits in opposition to Merck's Motion for Summary Judgment.

determination *de novo*." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993). "[S]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Id.* (citation omitted). "[A]t the summary judgment stage, a court is not to weigh the evidence or make credibility determinations. Instead, these tasks are left for the fact-finder." *Id.* (internal citation omitted).

## SUMMARY OF ARGUMENT

**I.**     In denying Merck's motion for summary judgment, the district court correctly found that Plaintiffs have presented ample evidence that Merck's deceptive public statements on its labels caused Plaintiffs' antitrust injury.

A.     Plaintiffs have met their burden to show causation by presenting 274 pieces of evidence, which show that Merck's deceptive statements on its mumps-vaccine labels delayed the launch of a competing vaccine by over a decade. Each category of Plaintiffs'

evidence—Merck's internal documents, GSK's internal documents, and Plaintiffs' unrebutted expert reports—is sufficient to establish that Merck's conduct was the cause of Plaintiffs' antitrust injury.

B.    To the extent Merck disputes this evidence, resolving factual disputes regarding causation is a question for the jury.

C.    Plaintiffs presented what was required: causation evidence showing that GSK was "willing and able to supply" Priorix but for Merck's misconduct. Merck does not challenge that definition nor any piece of Plaintiffs' ample evidence satisfying the standard.

D.    Merck does not provide any evidence that breaks the chain of causation. Merck relies exclusively on cherry-picked excerpts from GSK's corporate designee's deposition about "business reasons" for GSK's delay. This testimony is not admissible and is contradicted by other testimony and numerous GSK documents. Merck also seeks to impose a newly created causation standard, not found in case law, that would require Plaintiffs to prove FDA "would have" approved GSK's Priorix sooner but for Merck's misconduct. This is not the law. Plaintiffs were required only to show GSK's willingness and ability to enter the market, and Plaintiffs have done so.

**II.**    Merck's focus on *Noerr-Pennington* doctrine is both legally incorrect and irrelevant. *Noerr-Pennington* does not entitle Merck to summary judgment where Plaintiffs base their antitrust claim on Merck's deceptive, public label claims and a substantial amount of other public documents. Even where Merck has communicated with FDA, these communications are not *Noerr* protected because they are not petitions—and at any rate, the communications fall under the sham exception to *Noerr*.

A.    Merck has never disputed that *Noerr-Pennington* does not immunize the deceptive statements on its labels, which were public statements in the marketplace. As the district court found, because Plaintiffs' claims stem from Merck's labels, there are material facts in dispute regardless of whether *Noerr* immunized other Merck statements. Even if *Noerr* applies to some of Merck's communications with FDA, Plaintiffs' evidence is based on facts indisputably outside of *Noerr* protection such as public statements, Merck's own internal documents, GSK's internal documents, and unrebutted expert testimony. Moreover, *Noerr* does not provide a vehicle for monopolists to launder unlawful marketplace conduct through the First Amendment

31

immunity merely by communicating about that conduct to a regulator. Merck has also never identified the full list of evidentiary documents, but rather focused only on a few limited FDA communications that are not petitioning but rather required responses to a government agency.

B.    Merck's challenged communications with FDA entailed only mandatory responses to Form 483 and Warning Letters from FDA and BPDR submissions; *Noerr* does not protect these types of responses to regulators because they are not petitions. Even if Merck's mandatory responses to FDA are "petitioning," Merck's deceptive communications with FDA constitute a material misrepresentation qualifying for *Noerr*'s sham exception. Merck waived any challenge to the accuracy of the documents at issue, meaning factual disputes surrounding whether Merck's communications were a sham must be resolved by a jury.

## ARGUMENT

## I.    Substantial Evidence Supports The District Court's Finding Of A Genuine Issue Of Material Fact On Causation.

### A.    The District Court Detailed "Numerous Pieces of Evidence" Establishing Merck's Delay of GSK's Entry.

At summary judgment, Plaintiffs are required only to provide "sufficient evidence from which a reasonable factfinder could find the requisite inference of causation." *Carvalho-Grevious v. Del. State Univ.*,

851 F.3d 249, 261 (3d Cir. 2017). Plaintiffs satisfied their burden.

As it did in the district court,[125] Merck erroneously seeks summary judgment by asking this Court to ignore hundreds of exhibits submitted in opposition, including its own and GSK's internal documents.

### 1.    Merck's internal documents establish causation.

The district court properly considered Merck's internal documents where it admitted it was noncompliant and rejected a label change because it would allow GSK to enter the market.[126] Appx35. By 2001, Merck knew its mumps vaccine label could no longer support its potency, shelf-life, or seroconversion claims. Thus, its mumps vaccine was "misbranded" and had a "compliance issue" risking potential recall or other FDA action.[127]

But Merck refused to correct its labels because it would "open the

---

[125] The district court found "in response to many of the facts Plaintiffs put forth . . . concerning Merck's alleged anticompetitive conduct, Merck did not admit or dispute the facts, but rather, claimed the facts 'do not bear on the issues material to Merck's Motion for Summary Judgment.'" Appx6.

[126] Appx35.

[127] *See supra* notes 29–30 and accompanying text.

door wider for competition" and be "potentially non-marketable."[128]

Merck feared that "relax[ing] the criteria of success would lower the bar

for the competition and facilitate [GSK's] entry into the U.S. market."[129]

Merck knew that if the label "changed from 96% to 75%," then "[GSK]

has better sensitivity and higher seroconversion rates."[130]

Merck was even specific on how moving "from 24 to 18 or 12

months will have a commercial impact on the business," including an

"international loss of share due to a competitive disadvantage

(competitors at 24 months)."[131] Merck decided not to correct its labels,

and recognized that this effort "succeeded in 'raising the bar' for

competition at every available opportunity."[132] Merck later reported

hearing from GSK that, "because of M-M-R®II, the bar had been set

very high."[133]

These striking admissions of Merck's plan to prevent GSK from

entering the market are sufficient to raise a triable issue by themselves.

---

[128] Appx5375; Appx5320.

[129] Appx5327.

[130] Appx7716.

[131] Appx4962.

[132] Appx7281.

[133] Appx9817; Appx8209.

*Est. of Knoster v. Ford Motor Co.*, No. 01-cv-3168(MLC), 2008 WL 5416399, at *6 (D.N.J. Dec. 22, 2008) (finding a triable issue where the defendant's own documents "acknowledged" its conduct as a "possible cause" of Plaintiffs' injury).

### 2. GSK's documents and testimony establish causation.

The district court also properly considered GSK's corporate testimony that ████████████████████████████████████ ████████████████████████████████████ ██████ and GSK's public statement that "having access to Merck Mumps ELISA" in 2012 ultimately allowed GSK to match Merck's seroconversion claim and enter the market.[135] ████████████ ████████████████████████████████████ ████████████████████ ██ ████████████████████ ████████████████ ██ ████████ ██

Internal documents from a competitor showing it was ready to enter the market raise a genuine issue of material fact. *In re Nexium*

---

[134] Appx1471 (Tr. 97:3–8).
[135] Appx9816; Appx3381.
[136] Appx9812; Appx7111.
[137] Appx9812; Appx7111 (emphasis added).

*(Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 289 (D. Mass. 2014), *aff'd*, 842 F.3d 34 (1st Cir. 2016) (denying summary judgment where a competitor's "internal communications and documents" demonstrated it was "well on its way to obtaining tentative approval" for a competing drug). Upon learning of the allegations in this case, GSK thought it was delayed by Merck's misrepresentations: GSK executives considered whether Merck's conduct might have "implications on our 'non inferiority' benchmark of the US registration"[138] and might result in "[e]arlier introduction of Priorix . . . in the US??"[139] GSK's internal documents and testimony, by themselves, are sufficient to raise issues of material fact.

### 3.   Plaintiffs' unrebutted expert reports further establish causation.

Plaintiffs' expert reports independently establish causation. After reviewing over 600 documents, Dr. Copmann opined that if Merck had corrected the 24-month shelf-life or the seroconversion claim on its mumps-vaccine labels, those claims would no longer have stymied GSK's development, and GSK would have completed its clinical studies

---

[138] Appx9815–16; Appx3461.
[139] Appx9816; Appx3465.

within an eight to ten-year timeframe, (*i.e.*, as early as 2009).[140] The

district court rejected Merck's attacks on Dr. Copmann and relied on his

conclusions.[141]

Dr. Copmann further opined that if Merck had corrected its labels,

GSK would have been spurred to greater action: "[a] shortening of the

shelf life of MMR to 12 or 18 months would have created a significant

incentive for a competitor to enter the market with an MMR vaccine

that had a 24-month shelf life," because "all things being equal,"

purchasers "would likely shift to the product with a longer shelf life."[142]

Similarly, disclosure in the form of a label change that Merck "did not

have reliable and clinically relevant PRN data with greater than 90%

seroconversion results to support its regulatory submissions" would

have signaled to GSK that Merck's mumps vaccine monopoly was

vulnerable to competition.[143]

After considering over 400 documents, Dr. Kessler, former head of

FDA, testified that Merck's deceptive label claims "stood in the way of

---

[140] Appx1609.

[141] Appx49.

[142] Appx1612.

[143] Appx1605; Appx1612.

GSK and others to meet a standard which [Merck], itself, could not meet."[144] Dr. Kessler opined that "the claims set forth in Merck's MMRII and ProQuad labels could and do impact the standards for relative effectiveness that other manufacturers would have to meet to . . . market similar products in the United States."[145] Merck does not challenge Dr. Kessler's report and testimony.

These unchallenged expert reports, based on a careful consideration of the record, "[are by themselves] . . . sufficient to defeat a summary judgment motion." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994); *United States v. Care Alternatives*, 952 F.3d 89, 101 (3d Cir. 2020) (expert report was "sufficient evidence to create a genuine dispute of material fact"); *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138–39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge.").

Accordingly, Plaintiffs have offered substantial evidence of causation, and this Court should affirm denial of summary judgment.

---

[144] Appx1269 (Tr. 363:3–7).
[145] Appx2898.

## B.   Whether Merck Caused Antitrust Injury Is a Question for the Jury.

Merck may disagree with Plaintiffs' causation evidence, but the "cause of Plaintiffs' injury is a question of fact for the jury." Appx36; *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 257 (3d Cir. 1999) (declining to rule on causation in an antitrust case as a matter of law as causation is an "issue[ ] of fact best left to the jury"); *accord Thabault v. Chait*, 541 F.3d 512, 523 (3d Cir. 2008). Plaintiffs "need not exhaust all possible alternative sources of injury in fulfilling [their] burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9. (1969). Merck will still have the opportunity to persuade a jury to favor its evidence over Plaintiffs' evidence of causation. Appx36. But "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *In re Asbestos Prod. Liab. Litig. (No. VI)*, 822 F.3d 125, 136 (3d Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Merck fails to show why a jury cannot resolve these disputes of fact in Plaintiffs' favor.

## C.   There Is Ample Causation Evidence that Merck Does Not Challenge.

As Merck states, Plaintiffs are only required to show "evidence

that GSK was willing and able to supply its competing vaccine sooner but for Merck's exclusionary conduct." Br. 49 (internal quotation marks omitted). To determine whether a competitor was willing and prepared to enter the market, courts look to whether it has "the financial ability to enter the market, the background and experience that makes success possible, and that it has undertaken . . . significant steps toward entry." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 349a (4th & 5th eds. 2023); *accord Out Front Prods., Inc. v. Magid*, 748 F.2d 166, 170 (3d Cir. 1984); *Roxane Lab'ys, Inc. v. Smithkline Beecham Corp.*, No. CIV.A. 09-cv-1638, 2010 WL 331704, at *3 (E.D. Pa. Jan. 26, 2010). For pharmaceutical products, factors showing willingness and ability can include: evidence that the competitor had previously launched competing products; had manufacturing facilities, distribution networks, or other equipment and resources in place; had a familiarity with the FDA approval process; and was a well-established manufacturer in general. *See Roxane Lab'ys*, 2010 WL 331704, at *4; *accord Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 815 (D.C. Cir. 2001).

40

Plaintiffs submitted ample evidence demonstrating GSK's willingness and ability to supply Priorix. Merck does not dispute that GSK was willing and able to enter the market. Merck admitted that "[w]ith the infrastructure in facilities and competencies, GSK [was] well-positioned" to bring Priorix into the U.S. market,[146] and that Merck's vaccine was under "imminent threat"[147] with "no evident clinical weakness" that might hold up approval of Priorix.[148] Merck does not dispute that GSK had previously launched competing products and was familiar with FDA's approval process—GSK had received FDA approval of its hepatitis A and B vaccines, which directly competed with Merck.[149] Nor does Merck dispute GSK's status as a global vaccine manufacturer that licensed Priorix in over 100 countries before U.S. approval. Finally, ███████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████[150] This evidence demonstrates that GSK had "the financial ability to enter the market,

---

[146] Appx7743; Appx9776.
[147] Appx4844; Appx9776.
[148] Appx4842.
[149] Appx3906.
[150] Appx9743.

the background and experience that makes success possible, and that it has undertaken . . . significant steps toward entry." Areeda & Hovenkamp, *supra*, ¶ 349a.

### D. Neither GSK's Nor FDA's Actions Break the Chain of Causation.

Instead of quarreling with the sufficiency of Plaintiffs' causation evidence, Merck argues that GSK's purported "business reasons" for not entering the market sooner nevertheless entitle Merck to summary judgment. Merck would also require Plaintiffs to prove FDA "would have" approved Priorix sooner but for Merck's misconduct, but this requirement is unmoored to any controlling case law.

#### 1. GSK's actions were foreseeable consequences of Merck's deceptive labels.

Merck provides no basis to reverse the district court's holding that a reasonable jury could find that Merck caused Plaintiffs' injury, where GSK's delay was a foreseeable consequence of Merck's conduct. Appx36. Merck relies solely on self-serving excerpts of GSK's corporate testimony regarding purported "business reasons" for GSK's delay, which "does not, at summary judgment, break the causal connection between the alleged antitrust violation and Plaintiffs' injury." *Id.*

42

### a. GSK's corporate designee's deposition testimony is not admissible, much less dispositive.

GSK's corporate designee's testimony cannot be the basis for granting summary judgment for two reasons. First, that testimony is inadmissible. Because GSK is a *non-party*, "to be admissible for purposes of summary judgment (and trial), [its representative's] testimony [is] subject to the personal knowledge requirement of Federal Rule of Evidence 602." *Alpek Polyester, S.A. de C.V. v. Polymetrix AG*, No. 2021-1706, 2021 WL 5974163, at *5 (Fed. Cir. Dec. 16, 2021) (first alteration in original). Merck fails to demonstrate that Cohen had the requisite personal knowledge under Federal Rule of Evidence 602 regarding the purported "reasons" for GSK's delay, and her testimony based on the purported knowledge of other GSK personnel is patently inadmissible hearsay under Rule 801(c).

While Merck never demonstrated that Cohen had the requisite personal knowledge to testify about any of the purported reasons for GSK's delayed U.S. market entry from 1997 to 2022, ███████

██████████████████████████████████

███████████████████████████████████

 These statements, and more, show that Cohen lacked the requisite personal knowledge to testify on the purported "five specific reasons" for GSK's delay.

Second, even if Cohen's testimony is admissible, an excerpt from non-party deposition testimony does not trump Plaintiffs' voluminous evidence at summary judgment. *See supra* Section I.A. As the district court ruled, it is the jury's role to weigh the totality of Cohen's

---

[151] Appx1468 (Tr. 27:8–23).
[152] Appx547 (Tr. 15:8–22).
[153] Appx552 (Tr. 64:12–15).
[154] Appx10059 (Tr. 57:13–16).

testimony against Plaintiffs' evidence that Merck caused GSK's delay in market entry. Appx36; *Anderson* 477 U.S. at 249.

> **b.   GSK's delay was both the foreseeable and intended consequence of Merck's deceptive labels.**

As the district court properly noted, "[e]ven if an antitrust violation is not the material cause of an injury . . . courts have consistently found the causation requirement satisfied . . . where that intervening conduct was the foreseeable consequence of the original antitrust violation." Appx34 (citing *In re Flonase Antitrust Litig.* ("*Flonase II*"), 798 F. Supp. 2d 619, 628 (E.D. Pa. 2011)).

Even accepting at face-value Cohen's deposition testimony about the five purported business reasons for GSK's delayed entry, it hardly severs any causal chain from Merck's anticompetitive conduct. Indeed, Cohen's *first* and *fourth* business reasons are just variations on a theme: shifts in GSK's business priorities resulting from Merck's conduct in raising barriers to entry.

Any decisions by GSK to shift its priorities were foreseeable consequences of Merck's anticompetitive conduct. *Flonase II*, 798 F. Supp. 2d at 628; *In re Suboxone (Buprenorphine Hydrochloride &*

*Nalaxone) Antitrust Litig.*, No. 13-md-2445, 2015 WL 12910728, at *2 (E.D. Pa. Apr. 14, 2015). Where anticompetitive conduct stifles a competitor's development, the chain of causation remains intact even when the competitor "tried different approaches to the problem of entry, but ceased each attempt" or shifted to another priority "when its futility became apparent." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176, 180 (E.D. Pa. 1976); *Flonase II*, 798 F. Supp. 2d at 632–33 (denying summary judgment where a nascent competitor refrained from purchasing an essential ingredient for its competing product because the defendant's misconduct made it futile to move forward); *Bristol-Myers Squibb Co. v. Ben Venue Lab'ys*, 90 F. Supp. 2d 540, 545 (D.N.J. 2000) (denying summary judgment where a competitor "had little practical incentive to pursue" FDA approval and "direct[ed] their resources" elsewhere due to the defendant's misconduct).

Merck, in fact, intended that its conduct would delay GSK's entry as it lauded itself for "succeed[ing] in 'raising the bar' for [] competition at every available opportunity."[155] To "delay and disrupt the launch of

---

[155] Appx7281.

Priorix into the market,"[156] Merck executed a plan to "mak[e] the review criteria used for the Priorix application more stringent."[157] Even though Merck knew its mumps vaccine was "misbrand[ed]"[158] and "out of compliance,"[159] it decided to continue misbranding its vaccines because "lowering the seroconversion rate in the label would help GSK."[160] In doing so, Merck forced GSK to keep trying to meet an unattainable standard that even Merck could not meet.[161] And Merck succeeded as it later reported hearing from GSK that, "because of M-M-R®II, the bar had been set very high."[162]

Nevertheless, as the district court found, GSK kept trying different approaches at all times between 1997–2022 to develop Priorix and stayed in communication with FDA to "work on the level of serology in order to validate its mumps . . . assays for future U.S. trials."[163]

---

[156] Appx9776; Appx4840; Appx4842.

[157] Appx9776; Appx5294.

[158] Appx9788; Appx7714.

[159] Appx9788; Appx5666.

[160] Appx9776; Appx5037.

[161] The launch of Priorix in the United States hinged on ███████████ ████████████████████████████████████ Appx1471 (Tr. 97:3–8); Appx18.

[162] Appx9817; Appx8209.

[163] Appx20. See Appx10119 for GSK's yearly activity.

GSK's continued efforts to "work on" mirroring Merck's mumps seroconversion claim negates any argument that "GSK did not pursue a MMRV vaccine" *solely* because of ██████████████████████ ████████████ Br. 42. Any de-prioritization of Priorix was caused by Merck's anticompetitive conduct.

Merck points to the shift from MMR to MMRV vaccines as the *third* reason for GSK "not actively pursuing Priorix." Br. 42. But GSK's prioritization from Priorix (MMR) to another *mumps*-containing vaccine, Priorix-Tetra (MMRV) cannot possibly be an intervening cause that breaks the chain of causation; Priorix-Tetra still had to mirror Merck's deceptive mumps-vaccine labels for U.S. entry.

Finally, the record contradicts the *second* and *fifth* reasons (concern about low sales and no "quantitative[] impact on its overall product portfolio") that Merck claims GSK did not come to market. Br. 42. ████████████████████████████████████████████ ████████████████████████████████████████████████████ ██

---

### 2. Plaintiffs are not required to prove that FDA "would have" granted GSK a license sooner.

Both this Court and the Supreme Court prohibit courts from drawing inferences from agency inaction. *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017) ("Generally, an agency decision on whether to act in a particular matter or at a particular time 'often involves a complicated balancing' of factors . . . . Reading agency tea leaves is therefore a vexing prospect . . . ." (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985))); *Altria Grp., Inc. v. Good*, 555 U.S. 70, 91 (2008) (holding that an agency's inaction did not "prevent a jury from considering [Plaintiffs'] claim"). Merck cites no case that requires Plaintiffs to prove that FDA "would have" granted GSK a license sooner. The two cases Merck cites are inapposite.

In *In re Wellbutrin XL Antitrust Litigation Indirect Purchaser Class*, 868 F.3d 132 (3d Cir. 2017), this Court ruled that the plaintiff could not establish antitrust injury because federal patent law blocked it from entering the market, regardless of defendant's misconduct. *Id.* at 165. Unlike *Wellbutrin*, here, there was no federal patent that would have prevented GSK's entry sooner.

Equally unhelpful for Merck is *Meijer, Inc. v. Biovail Corp.*, 533

49

F.3d 857 (D.C. Cir. 2008), in which the plaintiffs presented only "speculative" affidavits that were "ungrounded in fact"—two letters and briefings from FDA regarding the competitors' eligibility for review from a predecessor case. *Id.* at 864–65. The affidavits in *Meijer* are a far cry from Plaintiffs' voluminous evidence here, including Merck's internal admissions, GSK's documents, and Plaintiffs' "reliable"[166] expert opinions that were drafted after reviewing 400–600 documents.

Merck argues that because FDA has taken no action against Merck for its label today, that FDA would not have approved Priorix sooner. Br. 65. Irrespective of FDA action, Merck had an independent obligation to correct its label. 21 C.F.R. § 201.56(a)(2) (requiring prompt updates to labels "when new information becomes available that causes the labeling to become inaccurate, false, or misleading"). As the FDA indicated in its 2001 Warning Letter to Merck, "it is [Merck's] duty to ensure that [Merck] is in compliance with the provisions of the Federal, Drug, and Cosmetic Act, [including vaccine labeling] and all applicable regulations."[167] But Merck violated this duty because compliance would

---

[166] Appx46–49.
[167] Appx5408.

"help GSK['s]" market entry.[168]

### 3. The 2019 letters to FDA are irrelevant to causation.

Merck's focus on FDA's inaction after receiving Plaintiffs' expert submission in 2019 does *not* show that GSK would have been prevented from obtaining FDA approval earlier. By 2019, GSK had long since gained access to Merck's misleading ELISA, and Priorix was nearing approval. FDA's decision not to require a label change so far—which could have any number of explanations—does not prove how the agency would have acted decades prior and in a different competitive environment. *See Altria*, 555 U.S. at 89–90 ("The [agency's] failure to require petitioners to correct their allegedly misleading use of 'light' descriptors is not evidence to the contrary; agency nonenforcement of a federal statute is not the same as a policy of approval.").[169] Not only has Merck failed to cite any case law for its inference about FDA inaction,

---

[168] Appx5037.

[169] *See also In re HIV Antitrust Litig.*, No. 19-cv-02573, 2023 WL 3089820, at *5 (N.D. Cal. Mar. 7, 2023) ("[E]ven if something could be gleaned from FTC or New York AG inaction [by not challenging or requiring changes to a settlement agreement], it would not be proper for that evidence to go to the jury because of the danger that the jury would give undue weight to the agency's conclusions.").

but Merck also ignores the Third Circuit's rejection of speculation about a federal agency's inaction.

In *Lipitor*, this Court rejected the district court's dismissal of plaintiffs' antitrust claims and held that "it [was] erroneous to conclude that the FTC's inaction [in not objecting to a reverse payment settlement agreement] equate[d] to a determination that the [] agreement does not run afoul of the Sherman Act." *Id.* at 263. Thus, FDA's action or inaction on Merck's label is not evidence of anything, much less conclusive evidence.[170]

In sum, Plaintiffs need not prove that FDA "would have" granted a license to GSK sooner. Rather, Plaintiffs need only show that GSK was willing and able to enter the market but for Merck's misconduct. The weight of such evidence should now go to the jury.[171]

---

[170] While it is not necessary for Plaintiffs to prove what FDA "would have" done, in any event, Dr. Copmann opined that had Merck corrected its labels, "beginning in 2001, the FDA would have likely accepted [GSK's] lower seroconversion rate as not inferior to Merck's M-M-R II" and GSK "[w]ould have been able to begin its clinical development program with PRN seroconversion as the primary endpoint." Appx1603.

[171] Merck also argues for reversal and summary judgment because, as a matter of law, antitrust plaintiffs may not show that "FDA-approved statements in a drug's FDA-approved label unlawfully harmed

## II.    *Noerr-Pennington* Does Not Immunize Merck's Anticompetitive Behavior.

Merck's *Noerr* argument is equal parts incorrect and irrelevant, as Plaintiffs' theory of harm does not depend on any of the documents Merck seeks to immunize under the doctrine. First, as the district court found, "Plaintiffs allege that the anticompetitive business regime centered on Merck's false and misleading *label claims*," which are clearly not petitioning under *Noerr-Pennington*.[172] Second, the limited communications with FDA that Merck does specify do not constitute petitioning; rather, they are required responses to a government agency. Even if some of Merck's statements are immunized, Plaintiffs have raised a genuine dispute of fact as to whether Merck's deceptive

---

competition." Br. 37. Merck cites no case law for this claim, nor could it: this is not the law. "Even when an industry is regulated substantially, this does not necessarily evidence an intent to repeal the antitrust laws with respect to every action taken within the industry." *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 389 (1981). In *Harrison Aire, Inc. v. Aerostar International, Inc.*, 316 F. Supp. 2d 186 (E.D. Pa. 2004), *aff'd*, 423 F.3d 374 (3d Cir. 2005), the court held that the Federal Aviation Administration's involvement creating maintenance manuals for hot air balloons could not support summary judgment because there were no "regulations that essentially 'trumped' the antitrust laws" in the FAA. *Id.* at 211. Similarly, here, no FDA regulation has trumped the antitrust laws. [172] Appx32 (emphasis added).

communications with FDA constitute sham petitioning. Under Merck's reasoning, any regulated entity could cleanse its anticompetitive marketplace conduct by communicating about it, even falsely, to a regulator. This is not the law.

## A.    Merck's False Labeling Is Not Protected Petitioning.

The district court correctly held that *Noerr* could not apply to the core of Plaintiffs' case: that Merck's misleading *public label claims* raised the bar and delayed GSK's entry into the market. Per the district court, "even *if* Merck's *petitioning* conduct is immune under *Noerr-Pennington*, Plaintiffs allege that the anticompetitive business regime centered on Merck's false and misleading label claims."[173] Merck does not claim its label is immune under *Noerr-Pennington*, nor could it, given the clear case law showing that Merck cannot "mix[] private . . . acts for which there is no antitrust immunity" (*i.e.*, printing deceptive labels) with "the acts of petitioning public officials" (*i.e.*, communications with FDA) to shield itself. *See Barton's Disposal Serv., Inc. v. Tiger Corp.*, 886 F.2d 1430, 1436 (5th Cir. 1989).

---

[173] Appx32 (emphasis added).

*Noerr* does not immunize "action in a private marketplace." *Ticor Title Ins. Co. v. F.T.C.*, 998 F.2d 1129, 1138 (3d Cir. 1993). The doctrine protects only legitimate "petitioning to secure government action." *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem. Hosp.*, 185 F.3d 154, 158 (3d Cir. 1999); *accord Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 807 (2d Cir. 1983) ("AT & T cannot cloak its actions in *Noerr-Pennington* immunity simply because it is required, as a regulated monopoly, to disclose publicly its rates and operating procedures."). Put differently, "if the restraint directly results from private action there is no immunity. . . . Passive government approval is insufficient." *In re Lipitor*, 868 F.3d at 264 (citations omitted).

When a defendant's conduct is partially protected under *Noerr*, courts still "consider the evidence of the remaining challenged conduct in the aggregate to see if it is sufficient to support antitrust liability." *Mercatus Group, LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011). In *Ticor Title*, for example, a title insurance company argued that its collective rate setting was "petitioning" activity because the rates were first approved by each state's insurance department, making the rates immune under *Noerr*. 998 F.2d at 1138. This Court rejected

the company's invocation of *Noerr* because its decision to fix its collective rate was "nothing more than action in a private marketplace" and could "more aptly be characterized as commercial activity with a political impact [] than as political activity with a commercial impact." *Id.* (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 507 (1988)); *see also Barton's Disposal Serv.*, 886 F.2d at 1433, 1436 (immunity for certain petitioning did not extend to its predatory pricing scheme; "[d]irect interference in the business of a competitor is not shielded").

Merck invokes *Noerr* by reference to only its mandatory "respon[se] to a Form 483 or Warning Letter from FDA, or [] BPDRs when the company has an obligation to report a deviation or an unexpected event in manufacturing"—not its label claims.[174]

As detailed above, Plaintiffs presented substantial evidence (internal Merck and GSK documents as well as unrebutted expert testimony) that Merck's label claims caused GSK's delayed market entry, regardless of any communications with FDA. As the district court held, "[t]here is additional evidence contained in Merck's internal

---

[174] Br. 29; Appx30.

documents stating that they were out of compliance, but changing their label was unacceptable because it would allow GSK to enter the market."[175] Like fixing rates in *Ticor Title* and predatory pricing in *Barton's Disposal Service*, antitrust injury caused by Merck's public *labels* here precludes application of *Noerr. See Ticor Title*, 998 F.2d at 1138; *Barton Disposal Serv.*, 886 F.2d at 1436.

Here, the district court determined that Merck's unprotected conduct was sufficient to support antitrust liability, and Merck did not grapple with that evidence either in the district court or on appeal. At best, Merck's assertion that *Noerr* protects its communications with FDA raises issues of admissibility, which the district court can address exhibit-by-exhibit at trial.

As the district court also held, Plaintiffs can still use any of these documents that are "relevant to showing Merck's intent to exclude GSK."[176] It is "within the province of the trial judge to admit" petitioning activity "if it tends reasonably to show the purpose and

---

[175] Appx35.
[176] Appx32.

character of the particular transactions under scrutiny." *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965).

## B. Merck's Communications with FDA Are Not Protected by *Noerr-Pennington*.

Although the Court need not reach this issue, it should also affirm the district court's conclusion that *Noerr* did not apply to Merck's FDA submissions. Merck never identified which FDA communications it contends are protected by *Noerr*, and it is too late to do so in an appellate reply brief. As the district court noted, "Merck did not describe the petitioning at issue . . . but rather, just cited to the Plaintiffs' general allegations in the Amended Complaint."[177]

### 1. Merck's response to FDA enforcement is not petitioning.

Merck's opening brief identifies a handful of communications where it was "*responding to* a Form 483 or Warning Letter from FDA, or [] submitting BPDRs when the company has an obligation to report a deviation or an unexpected event in manufacturing." Br. 29 (emphasis added). Merck's responses to FDA are not petitioning actions but rather required answers in a regulatory proceeding. *Noerr* immunizes only

---

[177] Appx31.

"solicitation of governmental action with respect to the passage and enforcement of laws." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 707 (1962) (quoting *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961)). *Noerr* immunity does not extend to communication that is "a mere *incident* of regulation." *Litton*, 700 F.2d at 807 (emphasis added); *see also In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 751–52 (C.D. Cal. 2022) (rejecting *Noerr* immunity for statements "in response to statutory reporting requirements or at the request of" an agency). Merck's responses to FDA enforcement actions do not qualify as petitioning, which provides an "alternative ground" to affirm the district court. *Tse v. Ventana Med. Sys., Inc.*, 297 F.3d 210, 228 (3d Cir. 2002).

### 2. The "sham" exception applies to Merck's deceptive communications with FDA.

Even if Merck's required regulatory submissions to FDA are petitioning, they would not be immune under *Noerr*'s sham exception. Government petitioning is a sham when it satisfies a two-part test. First, it "must be objectively baseless in the sense that no reasonable [party] could realistically expect success on the merits." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122–23 (3d Cir. 1999) (quoting

*Pro. Real Estate Inv'rs v. Columbia Pictures* ("*PRE*"), 508 U.S. 49, 60 (1993)). Second, looking at the party's "subjective motivation," the petitioning must "conceal[] an attempt to interfere directly with the business relationships of a competitor, through the use of governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 123 (emphases removed) (quoting *PRE*, 508 U.S. at 60–61).

When a party's petition contains misrepresentations, the Court "determine[s] whether [the party's] petition was objectively baseless under the Supreme Court's test in *PRE*, without regard to those facts that [the plaintiff] alleges [the party] misrepresented." *Id.* at 123. "[A] *material* misrepresentation that affects the very core of a [party's] case will preclude *Noerr-Pennington* immunity." *Id.* at 124.

"The question whether a petition is a sham 'is generally a question of fact for the jury[.]'" *In re Flonase Antitrust Litig.* ("*Flonase I*"), 795 F. Supp. 2d 300, 310 (E.D. Pa. 2011) (alteration in original) (quoting *Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 612 n.9 (5th Cir. 1985)). "A court should only rule on the objective baselessness prong as a matter of law '[w]here there is no dispute over

60

the predicate facts of the underlying petitions.'" *Id.* (alteration in original) (quoting *PRE*, 508 U.S. at 63); *accord Pers. Dep't, Inc. v. Pro. Staff Leasing Corp.*, 297 F. App'x 773, 780 (10th Cir. 2008).

Here, the district court found disputes of fact precluding summary judgment as to the sham exception, as Merck simply did not challenge or dispute many "paragraphs in Plaintiffs' Additional Disputed Facts in Opposition to Summary Judgment that described the facts surrounding the submissions to the FDA." Appx31. These undisputed facts include: (1) Merck's representations to FDA in its March 8, 2001 final response to the FDA Warning Letter and its BPDRs in March and April 2001 that it had solved the potency problem; (2) Merck's internal analysis that FDA gave "no negative feedback" because Merck had represented that all of its vaccine lots met the label requirements, and (3) Merck's admission that it lied to FDA through those representations because its "corrective actions . . . did not ensure [it met] 4.3/dose at expiry as previously indicated."[178] A reasonable jury find that these facts show that Merck knowingly misrepresented the specifications of its vaccines, and that the misrepresentations caused FDA to have "no negative

---

[178] Appx9784; Appx5575.

61

feedback."[179] *See Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, No. CV 00-1693-PA, 2003 WL 24901381, *7–9 (D. Or. July 5, 2003) (citing to *Cheminor* and applying sham exception when "[t]he agency necessarily relied upon the information furnished by the Defendant" because "[o]nly Defendant knew the true figures").

Merck's reliance on *Wellbutrin* does not change the analysis. In *Wellbutrin,* the court considered whether "it was unreasonable for [the defendants] to file their suit" alleged to be a sham, 868 F.3d at 150, where "the reasonableness of a legal position . . . is itself a question of law." *Id.* at 151 (alteration in original) (citation omitted). Here, there is no controlling question of law to consider. Rather, the question is whether Merck's factual statements to FDA were deceptive. *See id.* at 150. That is for the jury to ultimately decide.

Merck levels three challenges at the district court's application of the sham exception, all of which miss the mark. First, Merck argues that "the sham inquiry is about the propriety of the invocation of the process of petitioning," and Plaintiffs "have no evidence to suggest[] that their asserted injury flows directly from an abuse of process." Br.

---

[179] Appx9784; Appx5575.

28–29 (emphasis and internal quotation marks removed). To be sure, Plaintiffs do not allege injury from the process at all, never mind an abuse of that process. Critically, Merck ignores *Cheminor*, which held that "a *material* misrepresentation that affects the very core of a [party's] case" constitutes abuse of process under the sham exception. 168 F.3d at 124. Plaintiffs have alleged facts demonstrating that Merck made misrepresentations that caused FDA to give "no negative feedback."[180]

Second, Merck argues that the sham exception cannot apply to "successful" petitioning of FDA. But this argument is also foreclosed by *Cheminor*. Material misrepresentations that influence agency action are "successful" by definition; under *Cheminor*, these "successful" material misrepresentations fall under the sham exception. *Cheminor*, 168 F.3d at 124. The cases Merck cites involve petitioning in public contexts that "afforded all interested parties an opportunity to set the record straight." *Armstrong*, 185 F.3d at 163; *accord Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1062 (9th Cir. 1998) (process involving "public hearings," "written and oral arguments," "representation by counsel,"

---

[180] Appx9784; Appx5575.

and the ability "to question witnesses"). Here, there were no public proceedings in which a competitor could have challenged Merck, but rather only confidential lies to regulators behind closed doors. As the district court noted, "First Amendment rights are not immunized from regulation when they are used as an integral part of conduct which violates a valid statute."[181]

Further, "[p]assive government approval is insufficient" for *Noerr* immunity. *In re Lipitor*, 868 F.3d at 264 (citation omitted) (finding that neither the district court's approval of, nor FTC's review and failure to object to, reverse-payment settlement rendered the settlement *Noerr* protected). Here, Merck has failed to demonstrate that its communications to FDA were "successful" in the way that those in *Armstrong* and *Kottle* were "successful," given that Merck did not actually "request . . . government action" but instead submitted responses to "salvege the product" [sic] in connection with a regulatory enforcement action.[182]

---

[181] Appx75 (quoting *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972)).
[182] Appx5676.

Third, Merck argues that its deceptive statements to FDA cannot be a sham because they were part of a non-adjudicatory process, but this is beside the point. Merck cites an out-of-Circuit decision, *Mercatus*, which held that the sham exception could not apply to statements made in legislative settings, which, *inter alia*, are "subject to political influences," "subject to lobbying and other forms of ex parte influence," and "discretionary." 641 F.3d at 845–46. There, a hospital launched a "public relations campaign" to pressure a village board of trustees to deny development permits to a would-be competing hospital. *Id.* at 837–38. In contrast, here, FDA's proceedings were not legislative or public, FDA had no opportunity to hear from other interested parties, and FDA had clear standards on which to evaluate Merck's responses.[183] In addition to these dissimilar facts, *Mercatus* addressed a separate exception for fraudulent misrepresentation—an exception the Third Circuit rejects. *Compare id.*, with *Cheminor*, 168 F.3d at 124.

Further, it strains credulity to compare the strict standards under which FDA must regulate an essential vaccine given to nearly every child in the country with the manifestly political and discretionary

---

[183] *See* Appx9778–79; Appx9783–85.

deliberations of a village board.[184] By arguing that FDA's regulatory processes here are legislative, Merck invites the Court to hold as a matter of law that FDA's decisions on licensing and regulating vaccines are more influenced by lobbying and politics than by safety standards and statutory rules—a clear attempt to impugn FDA's impartiality, integrity, and professionalism. The Court should reject Merck's invitation.

Because the sham exception applies—even if Merck's communications to FDA qualify as petitioning activity (which they do not)—the Court should affirm the district court's order denying summary judgment on the sham exception.

## CONCLUSION

Plaintiffs have offered substantial evidence that Merck caused their antitrust injuries through conduct and public statements that *Noerr* does not immunize. This Court should affirm the district court's denial of Merck's motion for summary judgment.

Dated: March 8, 2024                      Respectfully submitted,

                                          /s/   *John A. Macoretta*
                                          _____

---

[184] *See* Appx9788–89; Appx4288.

John A. Macoretta
Jeffrey L. Kodroff
Diana Zinser
**SPECTOR ROSEMAN &
KODROFF PC**
Two Commerce Square
2001 Market Street, Suite 3420
Philadelphia, PA
Tel: (212) 496-0300
jmacoretta@srkattorneys.com
jkodroff@srkattorneys.com
dzinser@srkattorneys.com

Kellie Lerner
Jonathan Edelman
Laura Song
**ROBINS KAPLAN LLP**
1325 Avenue of the Americas,
Suite 2601
New York, NY 10019
Tel: (212) 980-7400
Fax: (212) 980-7499
klerner@robinskaplan.com
jedelman@robinskaplan.com
lsong@robinskaplan.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 31.1, I certify the following:

1.    This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12115 words, excluding the parts of the petition exempted by Federal Rule of Appellate Procedure 32(f).

2.    This Appellee's Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally space typeface using Microsoft Word in Century Schoolbook 14-point font.

3.    This brief complies with the electronic filing requirements of Local Rule 31.3(c) because the text of the electronic brief is identical to the text of the paper copies and because SentinelOne Version 23.3.3.264 was run on the file containing the electronic version of the brief and no viruses were detected.

March 8, 2024                                  /s/    *John A Macoretta*
                                                       John A. Macoretta

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on March 8, 2024. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.


March 8, 2024                                    /s/   *John A. Macoretta*
                                                 John A. Macoretta